FOWLER and others, Trustees, etc., Appellants, vs. SCOTT, Respondent.

*November 4 — December 1, 1885.*

BROTHERTOWN INDIANS: APPORTIONMENT OF LANDS: EVIDENCE. *(1) After allotment, patent to others void. (2-4) Evidence of allotment: Report of commissioners: Maps. (5) Tribal records: "Ancient instruments." (6) Persons of same name: Presumptions. (7) Validity of trust under act of Congress, April 20, 1878.*
PLEADING. *(8) Ejectment: Want of title in plaintiff.*

1. An allotment of a portion of the Brothertown reservation to a member of that tribe under the act of Congress of March 3, 1839, vested in the allottee the whole beneficial interest in the land allotted, and such allotment never having been vacated or set aside, a patent for the same land subsequently issued to certain persons in trust for the Brothertown Indians, under the act of April 20, 1878, is void.
2. The commissioners elected under the act of Congress of 1839 to make partition of certain lands among the Brothertown Indians, were required to make a full report showing the name of each person to whom land was allotted and the quantity allotted to each, with the metes and bounds or other definite description of each parcel, and to accompany said report with a map showing the divisions and partitions. In an action affecting the title to a portion of such lands there was offered in evidence a copy of the commissioners' report duly certified by the commissioner of the general land office, together with a map accompanying the same. The map was certified to by the surveyor as having been made for the use of the general land office, but was not signed by the allotment commissioners nor authenticated by the separate certificate of the commissioner of the land office. It corresponded, however, almost exactly with the report, and also contained certain mistakes referred to in an amendatory report. *Held*, that it was sufficiently identified as the map made and returned by the allotment commissioners.
3. The report of the commissioners, excluding the map, gave the names of the allottees and the number of the lot awarded to each, but did not specify the number of acres in each allotment or give any definite description thereof. The map itself supplied these deficiencies. *Held*, that the map was a part of the report; and that where the other portions of the report were silent, an allot-

ment on the map was sufficient to pass the whole equitable title to the allottee.

4. Evidence that another map of the lands in question, like the one above mentioned but drawn upon a smaller scale and without the names of the allottees thereon, was also connected with the report, having been sent to the land office later, would not have altered or impaired the effect of the larger map as a part of the report, and the exclusion of such evidence, therefore, if error, was immaterial.

5. The tribal records of the Brothertown Indians, purporting to have been made by the "town clerk," and shown to have been for many years in the office of the town clerk of Brothertown, are held to be *ancient instruments* and, as such, admissible in evidence to show an allotment of lands within their reservation to members of the tribe in severalty, made at a "town meeting" in 1835.

6. The commissioners elected to make partition of lands among the Brothertown Indians in 1839, allotted one tract to "Hannah Paul," and another to "the wife of Solomon Paul" whose name, in fact, was Hannah Paul. *Held*, that under the circumstances of this case it will not be presumed that there was but one person of that name, or that the allotments were not made to different persons.

7. *Quære* whether the act of Congress of March 3, 1839 (5 Stats. at Large, 349), put an end to the existence of the *tribe* of Brothertown Indians as such, and whether, if so, the act of April 20, 1878 (20 Stats. at Large, 513), did not restore the tribal functions sufficiently to enable the members of the tribe, as such, to take as beneficiaries of the trust thereby created.

8. In ejectment the want of title in the plaintiff is purely a legal defense and is well pleaded by a general denial.

APPEAL from the Circuit Court for *Fond du Lac* County. Ejectment for the north half of the west forty-five acres of lot 7 of the town of Brothertown, county of Calumet, and state of Wisconsin.

The plaintiffs claim the lot under a patent issued to them, and to deceased co-trustees, by the United States, dated June 10, 1878, which purports to grant to such trustees for the Brothertown Indians, among other lands, the lot in controversy. This patent was issued in attempted compliance with ch. 63 of the Laws of Second Session of the Forty-fifth Congress, entitled " An act to authorize the issue of a patent of certain lands in the Brothertown reservation, in

the state of Wisconsin, to the persons selected by the Brothertown Indians," approved April 20, 1878. 20 Stats. at Large, 513.

The defendant claims that the west forty-five acres of said lot 7 was set apart and allotted to one Hannah Paul, wife of Solomon Paul (both being members of the tribe of Brothertown Indians), in 1840, pursuant to an act of Congress in that behalf entitled "An act for the relief of the Brothertown Indians in the territory of Wisconsin," approved March 3, 1839. 5 Stats. at Large, 349. He also claims to be the owner in fee of the lot in controversy by virtue of mesne conveyances from Solomon Paul and wife to him.

After a trial of the action before the court, without a jury, the court gave judgment for the defendant, dismissing the complaint on the merits. This appeal is by the plaintiffs from such judgment.

The findings of fact upon which the judgment is founded are as follows:

"1. That prior to the dates hereinafter named, and up to the year 1839, the Brothertowns were a tribe of Indians residing in the state of Wisconsin, preserving and maintaining tribal usages, customs, and government among themselves, and that said tribe of Brothertowns was a branch or part of the tribe or nation known as the Menominee Indians.

"2. That by a treaty between the United States and said tribe of Menominee Indians, dated February 8, 1831, and a further treaty between the same parties, dated October 27, 1832, there was secured and set apart to the Brothertown tribe a tract of land lying on the east side of Lake Winnebago, in the territory of Wisconsin, comprising 23,040 acres, and the possession of said tract was entered into by said tribe; that thereafter said tract of land was subdivided among the various members of said tribe in accordance

with their tribal government at that time existing, and that, in the year 1834, a tract of land, corresponding with and being the same as lot seven (7) of the Brothertown reservation, mentioned in the complaint, was assigned and set apart by the unanimous consent of said tribe to one Solomon Paul, who was then a member of said Brothertown tribe; that said Solomon Paul was in the occupancy of said land under said assignment at and prior to the allotment and apportionment of said reservation under the act of Congress of the year 1839, hereinafter mentioned.

"3. That by an act of Congress, entitled 'An act for the relief of the Brothertown Indians in the state of Wisconsin,' approved March 3, 1839, it was enacted that said tract of 23,040 acres of land, reserved to said Brothertown tribe as aforesaid, might be partitioned off and divided among the different individuals comprising said tribe by commissioners elected in accordance with said act, and that after such partition and division the several pieces and parcels should be held by the members of said tribe, severally and separately, in fee simple. That said commissioners were required by said act to make to the president of the United States a full report of such apportionment, giving the name of each person to whom any land was apportioned, with the description and quantity assigned to each, and were to accompany said report with a fair and accurate map of the whole, showing the divisions and partitions referred to in the report.

"That the said commissioners in their allotment under said act of Congress duly assigned and allotted to the 'wife of Solomon Paul,' Hannah Paul, the west forty-five acres of lot 7 of the Brothertown reservation aforesaid, which included within it all of the premises described in the complaint in this action, but by mistake and inadvertence omitted the same from the report made as required by said act, except in so far as the same appears upon the map

which accompanied the said report, and which I find to be a part of said report.

" That since said allotment of said west forty-five acres of said lot 7 the premises described in the complaint have been continuously claimed by said Hannah Paul, ' wife of Solomon Paul,' and her grantees, and the various parties through whom, by successive conveyances reaching back to said Hannah Paul, the defendant derives his title, and this defendant, down to the present time.

" 4. That at and prior to the date of the patent to the plaintiffs set forth in the complaint the plaintiffs had notice of and were aware that the premises aforesaid had been allotted under said act of Congress of March 3, 1839, to said Hannah Paul, and that the same had since such allotment been claimed and occupied by her and her grantees.

" 5. That the defendant is the equitable owner of the premises described in the complaint, and is entitled to retain the possession thereof.

" 6. That the title which the plaintiffs received by the patent mentioned in the complaint, they received for the benefit of the defendant, and the benefit of such patent inures to the defendant in this action.

" 7. That the defendant is entitled to the possession of the premises described in the complaint, and does not unlawfully withhold the same from the plaintiffs."

*Elihu Colman*, for the appellants.

For the respondent there was a brief by *Spence & Hiner*, and oral argument by *Mr. Spence*.

Lyon, J. If the west forty-five acres of lot 7, in the Brothertown reservation, was legally allotted to Hannah Paul, although never patented to her, such allotment vested in her the whole beneficial interest in the lot, and the patent subsequently issued to the plaintiffs and their deceased co-trustees (under which the plaintiffs claim) is void. In such

case the government has, at most, only the naked legal title, which it holds in trust for the original allottee and her representatives or grantees, and cannot convey it to a stranger. If authority be desired to propositions so manifestly correct and just, it may be found in the language of the supreme court of the United States in *Wirth v. Branson*, 98 U. S. 118. It is there said: "The rule is well settled by a long course of decisions that when public lands have been surveyed and placed in the market, or otherwise opened to private acquisition, a person who complies with all the requisites necessary to entitle him to a patent in a particular lot or tract is to be regarded as the equitable owner thereof, and the land is no longer open to location. The public faith has been pledged to him, and any subsequent grant of the same land to another party is void, unless the first location or entry be vacated and set aside." In that case a bounty land-warrant had been lawfully located on the land claimed, and subsequently a patent for the land was issued to another adversely to the claim under the warrant. The same principle is clearly applicable to the present case.

If the allotment was made to Hannah Paul, every necessary act was done to entitle her to a patent for the lot, and such allotment was never vacated or set aside. In that case it is quite immaterial whether the defendant has or has not succeeded to her title. The plaintiffs must recover, if at all, on the strength of their own title. That failing, their action fails. The trial court found such allotment was legally made, and dismissed the complaint on the merits. If the testimony supports the finding, the judgment is correct; otherwise, probably, it cannot be upheld.

Does it sufficiently appear that the west forty-five acres of lot 7 was legally allotted to Hannah Paul? The documentary evidence bearing upon this question consists of a copy of the report made by the commissioners, pursuant to the act of 1839, from the office of the register of deeds of

Calumet county, certified by the commissioner of the general land office in the form required by an act of Congress of 1812 (5 Stats. at Large, 716), which was held sufficient in *McLane v. Bovee*, 35 Wis. 27. Accompanying this report was a map, in the register's office, of the Brothertown reserve, divided into lots, with the name of the person to whom each lot was allotted written thereupon. It is certified to by the surveyor under date of July 13, 1840, as having been made for the use of the general land office, but is not signed by the allotment commissioners, or authenticated by the separate certificate of the commissioner of the land office. Such report and map were put in evidence by the defendant, under objection by the plaintiffs to the map as testimony. Two books were also offered in evidence by the defendant, and received under like objection, claimed to contain the tribal records of the Brothertown Indians before the allotment of their lands in severalty. From these it appeared that, by a unanimous vote of the tribe, at a meeting thereof denominated a town meeting, held September 2, 1835, the land constituting lot 7 was assigned in severalty to Solomon Paul. A large number of lots were, in like manner, assigned to various members of the tribe.

In the report of the allotment commissioners, excluding the map, the east fifty acres of lot 7 is allotted to Solomon Paul, but no mention is made of the west forty-five acres thereof. On the map the east fifty acres is marked with the name of Solomon Paul, and on the west forty-five acres is written "wife of Solomon Paul." The defendant also introduced oral testimony (received under objection) to the effect that Hannah Paul was the wife of Solomon Paul; that they went into possession of lot 7 under the tribal allotment of 1835, and still lived thereon when the allotment was made under the act of 1839; and that the commissioners did, in fact, allot the west forty-five acres of that lot to Hannah Paul. It was stipulated on the trial that

Solomon Paul and wife conveyed the lot in controversy, in 1855, to a grantor (through mesne conveyances) of the defendant.

The learned counsel for the plaintiffs maintains that the map is not sufficiently identified as the map returned by the allotment commissioners to the general land office; and, if identified, that it is no part of the report of the commissioners. He argues therefrom that the entry, "wife of Solomon Paul," on the west forty-five acres of lot 7, as delineated on the map, does not constitute an allotment, and, the report making no mention of an allotment of that parcel of land to her, none was ever made. These propositions will now be considered.

As to identity, the map itself furnishes sufficient intrinsic evidence that it was made and returned by the allotment commissioners. The report mentions nearly 500 allotments, giving the name of each allottee, and the number and fraction of his or her lot. An examination of the map shows that, with but very few exceptions, and those manifestly accidental, the map corresponds throughout with the report. The act of 1839 required the commissioners to accompany their report with a map. Finding a map in the proper office which corresponds so nearly with the report, it must be presumed that they did their duty, and that the map before us was made under their direction, and returned by them, as a compliance with the requirements of the act of 1839 in that behalf.

There is still another proof of the identity of this map. In 1845 the allotment commissioners made an amendatory return to the commissioner of the land office, pointing out certain errors which had been discovered in the report and map. In one case they say: "Fractions 1, 2, 3, 4, 5, of west half of lot 148, were designated for Benjamin G. Fowler. In this case the map in your office is wrong in setting the aforesaid five fractions to Thos. Kiness." Looking at the

map, we find those fractions marked to Thos. Kiness. This is very cogent proof that we have the right map before us.

Is the map part and parcel of the report? Section 5 of the act of 1839 requires the commissioners, after having made partition and division of the reservation as therein-before provided, to make "a full report of their proceedings in the premises, setting forth the name of each person to whom they have apportioned any part of said land, the quantity apportioned or allotted to each, with the metes and bounds or other definite description of each several piece or parcel of land, and they shall accompany the said report with a fair and accurate map of the whole, showing the divisions and partitions aforesaid." The report, excluding the map, gives the names of allottees and the number of the lot, or fraction of a lot, awarded to each. In but few cases does it specify the number of acres in a given allotment. Neither does it purport to give metes and bounds, or any definite descriptions of the parcels of land allotted. Without the map the descriptions are unintelligible, and the report would utterly fail to come up to the requirements of the act of 1839. But read the map with the report, and as an integral part of it, and the provisions of the act above quoted are complied with in every particular. It seems very clear to us that the map should be so read and regarded, and that the act should be construed as meaning that the report should contain the map therein required. It necessarily results from these views that the map is just as high evidence of an allotment as are the other portions of the report; and if, as in this case, the latter is silent, an allotment on the map is sufficient to pass the whole equitable title to the land to the allottee, with the full right to the possession thereof, leaving in the government only the naked legal title. The learned circuit judge so held.

If other proof were required to establish the fact that

the west forty-five acres of lot 7 was allotted to Hannah Paul, such proof is found in this record. The books already mentioned, which contain tribal records previous to the allotment, show that allotments of portions of the Brothertown reserve were made by the tribe to many of the members thereof, in severalty, and that lot 7 was so allotted to Solomon Paul in 1835. These allotments usually contained 100 acres each, but lot 7 abutted Lake Winnebago on the west, and was fractional, containing but ninety-five acres. The act of 1839 distinctly recognized the existing laws, customs, usages, and agreements of the tribe, and directed that lands then held or possessed by members of the tribe in severalty should, as far as the same could consistently be done, be allotted to the several occupants thereof, unless a person occupied more than he was justly entitled to, in which case the overplus might be apportioned to others. See sections 2, 4. A comparison of the tribal allotments of 1835 with the map shows that these requirements of the act of 1839 were faithfully executed by the commissioners.

It satisfactorily appears that Solomon Paul went into possession of lot 7 under the tribal allotment, and was living thereon with his wife, Hannah Paul, when the allotment under the act of 1839 was made. The last allotments usually contained fifty acres each, in one body, and ten acres elsewhere. So the commissioners appropriated the east fifty acres of lot 7 to Solomon Paul. The east side of this tract abutted a highway, and it is very probable that the dwelling of the allottee and his wife and the principal improvements were situated thereon. Under these circumstances it would be very natural that the wife should have desired the balance of the farm to be allotted to her, and that the commissioners should have so allotted it. Moreover, the presumption is (there being no proof to the contrary) that Hannah Paul remained in actual possession and occupancy of the portion of lot 7 in controversy in this action until

she and her husband conveyed the same in 1855. These facts, aside from the parol proof that the west forty-five acres of lot 7 was actually allotted to her, strongly corroborate the accuracy of the view above expressed that the entry on the plat of that tract in the map, "wife of Solomon Paul," was intended to be and in fact was an effectual allotment thereof to her.

It was argued that the tribal records were not sufficiently authenticated to entitle them to be read in evidence. We think otherwise. They are *ancient instruments* within the meaning of that term as used in the law of evidence. They purport to have been made by a tribal officer denominated a "town clerk." Such an officer is recognized by the act of 1839, which provides, in section 5, that the report and map of the allotment commissioners, or a copy thereof, shall be deposited "with the town clerk of said tribe." They were proved to have been in the office of the town clerk of Brothertown for many years, and there was other testimony tending to show that they were the tribal records. Besides, the books in which these records are contain abundant intrinsic evidence of a most interesting character, of the genuineness of the records. These facts render the records admissible in evidence. See 1 Greenl. Ev. §§ 21, 141, 570, and notes.

The commissioners made an allotment to "Hannah Paul," by name, of fifty acres in a portion of the town remote from lot 7. It is argued that, because there is no proof that there were two allottees of that name, it must be assumed that the wife of Solomon Paul is such allottee, which, of course, would make strongly against the claim that she was the allottee of a part of lot 7. It is sufficiently evident, however, that when one allotment was made to "Hannah Paul" and another to "the wife of Solomon Paul" the commissioners were making allotments to two different persons. The allotments may have been made in that

form to distinguish between two of the same name, or the commissioners may not have known the name of the wife of Solomon Paul. The former is the more probable reason. After so great a lapse of time it ought not to be presumed that there was but one Hannah Paul in the tribe, when the map contains intrinsic evidence that there may have been, probably were, two of that name. A witness introduced by the defendant testified that his mother was a Brothertown woman, named Hannah Paul, and that she had land in the north part of the town. The land allotted to Hannah Paul was on the north line of the town. Whether or not the mother of the witness was ever the wife of Solomon Paul does not appear. The testimony is not very significant, and we have given no weight to it.

Counsel for the plaintiffs offered in evidence a copy of a map of Brothertown, duly authenticated by the certificate of the commissioner of the general land office, and offered to testify that he examined the records of that office in May, 1883, and found two maps connected with this allotment report, one similar to that in evidence, and the other the original of the map so offered by him in evidence; also that he found a letter with the latter map showing it was sent to the office after the other map had been sent. The map and testimony were not received. If the offered testimony had been received, it could have had no influence upon the determination of the case. The rejected map is like the other, except it is drawn on a smaller scale and none of the names of allottees are written upon it. The offered testimony may be considered as in the case, and the map may be considered a part of the report of the allotment commissioners, yet it does not, in the least, affect the other map, or impair its standing as a part of such report. The testimony and map, had they been received, would not have helped the case of the plaintiff, and their rejection (if erroneous) was an immaterial error.

The point was made in the argument that the equitable title claimed by the defendant to the *locus in quo* is not well pleaded. We do not reach that question, because we hold that the plaintiffs have failed to establish their title thereto. The want of title in the plaintiff is purely a legal defense, and such defense was well pleaded by the general denial in the answer.

It was pleaded in the answer as a defense to the action, and argued by the counsel, that the act of 1839 was fully executed about January 1, 1840, and that, by the provisions of such act, the tribe of Brothertown Indians ceased from that time to have any existence as a nation, body, or tribe; hence that there are no *cestuis que trust* capable of taking any beneficial interest under the patent issued to the plaintiffs and their deceased co-grantees in trust, and such patent is void for that reason. Having reached the conclusion on other grounds that the plaintiffs cannot maintain the action, it becomes unnecessary to decide on this appeal whether those propositions, or any of them, are well taken.

A determination of the validity of this defense was specially requested by counsel, for the alleged reason that other similar actions, founded on the same patent, are pending, in which the question may and probably will be material. Because of this the writer takes the liberty to suggest that it is at the least doubtful whether the tribal character of the Brothertown Indians has entirely ceased. The act of 1839 provides that, when its provisions in certain specified particulars have been executed, the rights of those Indians "as a tribe or nation, and their power of making and executing their own laws, usages, or customs as such tribe, shall cease and determine." But their right to receive annuities due them from the state of New York or the United States, the same as though the act had not been passed, is expressly reserved to them. Sec. 7. It would seem from the last provision that their tribal character is sufficiently

preserved to enable them in their capacity as a tribe to receive annuities. If so, why may not the members of the tribe, as such, be competent beneficiaries of a trust to receive money from other sources.

Again, the commissioners, under the act of 1878, in their report, make the following statement of the manner in which they disposed of a mill, and its appurtenances: "A mill, which was built a few years ago at the expense of the nation, together with all its water privileges, property, and appurtenances, as secured and released to the nation at former periods, by instruments in the possession of our authorities, has been assigned to a member of our tribe (elected at town meeting held for the purpose) in trust for the nation, who are the proprietors." It does not appear that the United States has ever made any objection to such disposition of the mill property. Should that property be hereafter sold by competent authority, no provision being made for distributing the proceeds, would not a court of equity direct the same to be distributed to the Brothertown Indians, according to the former usages, customs, and regulations of said tribe? In other words, would not the court regard them as competent to take as beneficiaries under a trust?

The act of 1878 disposes of the proceeds of the lands patented under it to trustees precisely as has just been suggested, and there seems no insuperable obstacle in the way of ascertaining who are the individual beneficiaries. Even if the tribal functions had entirely ceased before that act was passed, does not the act sufficiently restore them to enable the members of the tribe, as such, to take as beneficiaries of the trust created by the act?

The writer strongly inclines to the opinion that all of the questions here suggested, especially the last, should be answered in the affirmative.

*By the Court.*— The judgment of the circuit court is affirmed.