# UNITED STATES *v.* WILDCAT, A MINOR, ET AL.

ON CERTIFICATE FROM AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 741.   Argued April 11, 12, 13, 1917.—Decided May 21, 1917.

Acting under the enrollment provisions of the Curtis Act of June 28, 1898, and the Creek Agreement of March 1, 1901, the Dawes Commission was a *quasi* judicial tribunal, and enrollments made by it and approved by the Secretary of the Interior are presumptively correct; and, unless impeached by very clear evidence of fraud, mistake or arbitrary action, they are conclusive.

Whether or not a person alleged to be a member of the Creek Nation was living on April 1, 1899, is one of the questions going to the right of such person or his heirs to have his name enrolled under § 28 of Agreement of March 1, 1901, which the Dawes Commission was competent to decide; it is not a jurisdictional question, and an incorrect determination of it does not necessarily render the enrollment void.  *Scott* v. *McNeal,* 154 U. S. 34, distinguished.

In enrolling members of the Creek Tribe in 1901, the Dawes Commission was authorized to presume that a person enrolled as a member of the tribe on the tribal rolls of 1895 was living on April 1, 1899, in the absence of proof of his death before that day or of circumstances indicating that he had died before the commission acted.

The evidence in the case examined and found wanting in proof of such arbitrary action on the part of the Dawes Commission as would establish a mistake of law or fact warranting the impeachment of its action in enrolling the Indian in whose name the allotment in question was made and patented.

An attempt of the Secretary of the Interior to set aside the enrollment and allotment of a deceased Creek Indian by striking his name from the rolls without notice to his heirs is *ultra vires* and void.

When a Creek citizen dies after April 1, 1899, and an allotment is afterwards made, and deeds issued, in his name, the title is vested in his heirs by § 28 of the Agreement of March 1, 1901. *Skelton* v. *Dill*, 235 U. S. 206–208.

Under the Creek Agreement of March 1, 1901, § 3, it was permissible for the Dawes Commission to enroll tribal citizens and make them allotments when they failed to make selections for themselves.

Affirmed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Kearful,* with whom *The Solicitor General* and *Mr. S. W. Williams* were on the brief, for the United States.

*Mr. Joseph C. Stone, Mr. John J. Shea* and *Mr. C. B. Stuart* for Wildcat *et al.* The following counsel were on the brief: *Mr. A. C. Cruce, Mr. Geo. S. Ramsey, Mr. Malcolm E. Rosser, Mr. Edgar A. de Meules, Mr. Villard Martin, Mr. John Devereux, Mr. J. E. Wyand, Mr. K. B. Turner, Mr. M. E. Turner, Mr. J. B. Furry, Mr. E. C. Motter, Mr. P. J. Carey, Mr. W. C. Franklin, Mr. Burdette Blue, Mr. Thomas F. Shea, Mr. William A. Collier, Mr. Hazen Green, Mr. E. J. Van Court, Mr. Chas. A. Moon* and *Mr. Francis Stewart.*

*Mr. A. A. Davidson,* with whom *Mr. Preston C. West* and *Mr. James A. Veasey* were on the brief, for Bissett *et al.*

*Mr. R. C. Allen* and *Mr. James C. Davis,* by leave of court, filed a brief on behalf of the Creek Nation as *amici curiæ.*

*Mr. Grant Foreman* and *Mr. James D. Simms*, by leave of court, filed a brief as *amici curiæ.*

MR. JUSTICE DAY delivered the opinion of the court.

This action was begun by the United States, in behalf of the Creek Tribe of Indians, in the District Court of the United States for the Eastern District of Oklahoma, against Bessie Wildcat, and others, heirs of Barney Thlocco, a full-blood Creek Indian, to obtain cancellation of the allotment certificate and deeds for his allotment of 160 acres. The bill of complaint alleges that Thlocco was a Creek Indian by blood; that he died at about the beginning of the year 1899 and prior to April 1, 1899, and that he was not entitled to be enrolled as a citizen of the Creek Nation or to receive an allotment of any part of its lands under the acts of Congress; that on or about May 24, 1901, the Commission to the Five Civilized Tribes caused his name to be placed on the roll of Creek citizens by blood which that Commission was then preparing; that thereafter, on June 30, 1902, the Commission issued a certificate of allotment in Thlocco's name, and homestead and allotment patents purporting to convey the land allotted were executed by the Principal Chief of the Creek Nation on March 11, 1903, and approved by the Secretary of the Interior on April 3, 1903; that thereafter, on December 13, 1906, the Secretary of the Interior, by executive order, caused Thlocco's name to be stricken from the roll of citizens by blood of the Creek Nation, and he is not an enrolled citizen by blood or otherwise of the Creek Nation, and is not now and has never been entitled to an allotment of land therein because he has never been a lawfully enrolled citizen thereof, and because he died prior to April 1, 1899; and that the patents have never been delivered to Thlocco or to any other person, but are in the possession of complainant through its officers and agents. The bill

alleges that these instruments and proceedings constitute a cloud upon the Creek Nation's title to the land and that the existence of this cloud hinders and delays complainant in the performance of the duty imposed on it by law to allot and otherwise dispose of the lands and to wind up the affairs of the Creek Nation, and prays that the allotment certificate and patents be declared void and of no effect as instruments of conveyance; that the defendants be decreed to have no right, title, interest or estate in and to the land; that the title to the land be quieted in complainant and the Creek Nation; that whatever cloud is cast upon the title to the land by reason of the matters aforesaid be decreed to be dissolved and the land decreed to be a part of the public and unallotted tribal land of the Creek Nation, subject to disposition by complainant in accordance with law; that the enrollment of Barney Thlocco be cancelled, and that he, or any person claiming by, through, or under him, including the defendants, be decreed not to be entitled to participate in the disposition of the lands, moneys, or other property of the Creek Nation, and that the defendants be forever enjoined from asserting any claim of title to, or interest in the tract of land hereinbefore described, adverse to the complainant and the Creek Nation. It is alleged that no hearing was held or investigation made by the Commission and no evidence of any kind was obtained or had by it on the question of Thlocco's right to be enrolled; that no notice was given to the Creek Nation that his name was about to be enrolled; that there was no controversy, contest or adverse proceeding of any kind before the Commission in this respect; and that the Commission, in causing Thlocco's name to be placed on the roll of Creek citizens by blood, acted arbitrarily and summarily, and without knowledge, information or belief that he was living or dead on April 1, 1899, and acted on a mere arbitrary and erroneous assumption wholly unsupported by evidence or

information that he was living on that date and entitled to be enrolled.

The answer avers that Thlocco was living April 1, 1899, and denies that the Commission acted arbitrarily and without evidence in placing his name on the roll and allotting the lands to him, and alleges that the Commission, in causing both these acts to be done, was not guilty of any gross mistake of fact or of law, but acted upon evidence satisfactory to it, and sufficient in law and in fact. It further alleges that the Dawes Commission was vested with jurisdiction to determine what persons were entitled to enrollment as citizens of the nation, and entitled to allotment out of the tribal lands, and that its decision in that regard having been approved by the Secretary of the Interior, "said enrollment, allotment and patent cannot be cancelled, nor can the issue of fact upon which the Commission placed the name of said Barney Thlocco upon the approved Creek roll be tried again, and these defendants say that this court is without authority of law or jurisdiction to reopen or retry the question of fact sought to be put in issue by the United States."

Other defendants claimed an interest in part of the same property under a subsequent allotment and intervened for the same relief as was asked by the United States.

Upon the trial of the case the Government offered to show by witnesses and circumstances that Thlocco in fact died in January, 1899. Upon objection to this evidence by the defendants, the trial court ruled that the question whether Thlocco was living on April 1, 1899, was one of the questions which the law submitted to the Dawes Commission, and that its decision, placing Thlocco's name on the tribal roll, could only be attacked upon the ground of fraud, error of law, or gross mistake of fact, or upon the ground that the Commission acted arbitrarily and wholly without evidence; that it was not open to the Govern-

ment, for the purpose of attacking the allotment certificate and deeds to Thlocco, to retry the question of fact as to whether he was living April 1, 1899.

At the conclusion of the trial the Government renewed its offer of proof, to which objections were sustained on the ground just stated. A decree was then entered dismissing the bill for the reason that the Government had failed to show that the Commission in enrolling Thlocco acted arbitrarily and without evidence. Appeal was then taken to the Circuit Court of Appeals for the Eighth Circuit, which court certified certain questions of law to this court. Subsequently a writ of certiorari was issued, bringing the whole case here. (Judicial Code, § 239.)

The Government in the brief filed in its behalf reduces the questions necessary to decide the merits of this appeal to two: First, Should the evidence offered by the Government to show that Thlocco died prior to April 1, 1899, have been admitted? Second, Should the judgment of the District Court be reversed because the enrollment of Thlocco and the allotment to him were made arbitrarily and without evidence as to whether he was living or dead on April 1, 1899?

As to the first question, an understanding of certain legislation is necessary to its answer. By the Act of Congress of June 10, 1896, 29 Stat. 339, the Commission to the Five Civilized Tribes, more commonly known as the Dawes Commission, was authorized to hear and determine applications for citizenship in any of the Five Civilized Tribes. By that act the rolls of citizenship of those tribes as they then existed were confirmed and the Commission commanded in determining applications for citizenship to "give due force and effect to the rolls, usages, and customs of each of said nations or tribes." It was provided by the Act of June 7, 1897, 30 Stat. 84, that the term "rolls of citizenship" should mean "the last authenticated rolls of each tribe which have been approved by

the council of the nation, and the descendants of those appearing on such rolls," and certain others specified who had been lawfully added to the rolls. By the Curtis Act of June 28, 1898, 30 Stat. 495, 502, the Commission was authorized and directed to make correct rolls of the citizens by blood of the Creek Tribe, eliminating from the tribal rolls such names as might have been placed thereon by fraud or without authority of law, enrolling such only as might have lawful right thereto, and their descendants born since such rolls were made. It was provided that the Commission should make such rolls descriptive of the persons thereon, so that they might be identified thereby, and the Commission was authorized to take a census of each of said tribes, or to adopt any other means by them deemed necessary to enable them to make such rolls, with the right of access to all rolls and records of the several tribes, and with authority to administer oaths, examine witnesses, and send for persons and papers. The rolls so made, when approved by the Secretary of the Interior, were to be final, and the persons whose names were found thereon, with their descendants thereafter born to them, with such persons as might intermarry according to tribal laws, were alone to constitute the several tribes which they represented. By § 28 of the Creek Agreement of March 1, 1901, 31 Stat. 861, 870, it was provided that all citizens who were living on the first day of April, 1899, entitled to be enrolled under the above provisions of the Curtis Act, should be placed upon the rolls to be made by the Dawes Commission under that act, and provision was made for allotment to the heirs where any such citizen had died since that time. "The rolls so made by said commission," the act continues, "when approved by the Secretary of the Interior, shall be the final rolls of citizenship of said tribe, upon which the allotment of all lands and the distribution of all moneys and other property of the tribe shall be made, and to no

other persons." This agreement was ratified by the Creek
Council May 25, 1901, 32 Stat. 1971.

The legislation which we have outlined indicates the
purpose of Congress to make provision for the partition
of the lands belonging to the Creek Nation among the
members of the tribe, and to that end it authorized the
Dawes Commission to make investigation and determine
the names of such as were entitled to be on the rolls of
citizenship and to participate in the division of the tribal
lands. This purpose indicated in the Curtis Act of 1898
was emphasized by the so-called Creek Agreement of 1901,
subsequently ratified by the tribe. In that act the Com-
mission was authorized to investigate the subject, and
its action when approved by the Secretary of the Interior
was declared to be final. There was thus constituted a
*quasi*-judicial tribunal whose judgments within the limits
of its jurisdiction were only subject to attack for fraud
or such mistake of law or fact as would justify the holding
that its judgments were voidable. Congress by this legis-
lation evidenced an intention to put an end to controversy
by providing a tribunal before which those interested
could be heard and the rolls authoritatively made up
of those who were entitled to participate in the partition
of the tribal lands. It was to the interest of all concerned
that the beneficiaries of this division should be ascer-
tained. To this end the Commission was established
and endowed with authority to hear and determine the
matter.

A correct conclusion was not necessary to the finality
and binding character of its decisions. It may be that
the Commission in acting upon the many cases before it
made mistakes which are now impossible of correction.
This might easily be so, for the Commission passed upon
the rights of thousands claiming membership in the tribe
and ascertained the rights of others who did not appear
before it, upon the merits of whose standing the Commis-

sion had to pass with the best information which it could obtain.

When the Commission proceeded in good faith to determine the matter and to act upon information before it, not arbitrarily, but according to its best judgment, we think it was the intention of the act that the matter, upon the approval of the Secretary, should be finally concluded and the rights of the parties forever settled, subject to such attacks as could successfully be made upon judgments of this character for fraud or mistake.

We cannot agree that the case is within the principles decided in *Scott* v. *McNeal*, 154 U. S. 34, and kindred cases, in which it has been held that in the absence of a subject-matter of jurisdiction an adjudication that there was such is not conclusive, and that a judgment based upon action without its proper subject being in existence is void. In *Scott* v. *McNeal* it was held that a probate court had no jurisdiction to appoint an administrator of a living person and to sell property in administration proceedings after finding that he was in fact dead. In that case it was held that a sale of the property of a living person by order of the probate court without notice to him necessarily deprived him of due process of law by selling his property without notice and by order of a court which had no jurisdiction over him in any manner. The notice in such cases to his next of kin, the court held, was not notice to him, and to make an order undertaking to deprive such person of his property would be to take it by a judgment to which the living person was not a party or privy; and it was held that jurisdiction did not arise from the mere finding of the court that the person whose property was thus taken was in fact deceased. In the present case the Government had jurisdiction over these lands. It had the authority to partition them among the members of the tribe. *Shulthis* v. *McDougal*, 170 Fed. Rep. 529, 534; *McDougal* v. *McKay*, 237 U. S. 372, 383.

For this purpose it determined to divide the lands among those living on April 1, 1899, and constituted a tribunal to investigate the question of membership and consequent right to share in the division. We think the decision of such tribunal, when not impeached for fraud or mistake, conclusive of the question of membership in the tribe, when followed, as was the case here, by the action of the Interior Department confirming the allotment and ordering the patents conveying the lands, which were in fact issued. If decisions of this character may be subject to annulment in the manner in which the Government seeks to attack and set aside this one, many titles supposed to be secure would be divested many years after patents issued, upon showing that the decision was a mistaken one. The rule is that such decisions are presumably based upon proper showing, and that they must stand until overcome by full and convincing proof sufficient within the recognized principles of equity jurisdiction in cases of this character to invalidate them. *Maxwell Land-Grant Case,* 121 U. S. 325, 379, 381; *Colorado Coal & Iron Co.* v. *United States,* 123 U. S. 307.

As to the second contention, that the Commission acted arbitrarily and without evidence of the fact that Thlocco was living on April 1, 1899, there is no attack upon the finding of the Commission for fraud, and this record shows an earnest attempt to conform the rolls to the requirements of the law.

Thlocco's name appeared on the Tribal Rolls of 1890 and 1895 and on a census card made by a clerk of the Commission in 1897.

An enrolling clerk with the Dawes Commission testified that he entered the name of Barney Thlocco upon the census card on May 24, 1901; that at that time there were a great many names on the old rolls unaccounted for, and the party went to Okmulgee to get them to come out and get them enrolled; that a great many were brought in;

that Thlocco was one of those who were unaccounted for at that time, and the witness could not say whether his name was taken from the old census roll or whether someone appeared and asked for his enrollment; that after Thlocco's name was listed there was some investigation upon the question as to whether or not he was living or dead on April 1, 1899, but the Commission would have to be satisfied or have information of some kind that he was living on that date; that the Commission knew that Thlocco was dead in 1901 and it apparently was satisfied that he was living on April 1, 1899; that they would ask town kings and town warriors when they came in and anybody else if they knew this or that about the applicants; that because of a discrepancy between the ages of Thlocco on the census cards they must have had some information other than the old census card; that the invariable custom and practice was never to fill out one of the cards until they had some information from some source with reference to the question as to whether the applicant was living or whether he had died prior to April 1, 1899; that the Commission never arbitrarily listed any name; that no name was listed solely because it was on the Roll of 1895, but some particular individual evidence was required outside of that roll; that before the new rolls were sent to Washington the clerks and the chairman of the Commission would get together and go over every one of them.

The clerk who made out the census card in 1897 testified that as Chief Clerk of the Commission he helped in the enrollment; that a notation on the census card "died in 1900" was in his handwriting, but that he did not know who had given him the information or what use was made of the notation, except that it was intended that when the Commission came to pass on that name for final record on the roll an inquiry should be made as to when Thlocco died or whether he was dead and get the proper affidavit

and death proof; that the Commission did not arbitrarily enroll any Creek citizen without evidence, and that in every single case if the applicant did not appear some one who was regarded as reliable appeared for him and gave evidence until the Commissioner was satisfied that he belonged on the roll; that whenever any question was raised by the Creek Nation or its attorney with reference to the right to enrollment, or for any reason as to whether the applicant was living or dead, there was generally testimony taken in those cases; that with reference to those people whose names up to March, 1901, had not been accounted for, there were lists of these made and sent to the various town kings and various inquiries were made that way and report came back; that sometimes the party addressed came in and gave verbal testimony, and if it seemed clear to the Commission it was probably not reduced to writing; that if there was any question with reference to the matter it probably was reduced to writing; that the Commission had to be satisfied from the records; that the Commission never passed upon a card until it was completed; that the information may have been picked up piecemeal over a year or two, but the Commission was satisfied that the party was entitled to enrollment, and the records were made up for the purpose of the information of the Commission and to show such information as was necessary to enable the Commission to reach a decision.

One of the enrolling clerks at Okmulgee testified that if information was present that a name was entitled to go on the rolls, the roll was completed at Okmulgee; that if the Commission did not have this information they did not complete it; that the fact that Barney Thlocco's card was completed at Okmulgee indicated that the party who wrote the card was satisfied that Thlocco was living on April 1, 1899, and satisfied from evidence; that there was in all cases some evidence as to whether the citizen

was living or dead on April 1, 1899, before the rolls were recommended to the Secretary of the Interior.

The Acting Chairman of the Dawes Commission testified that they did not to his knowledge ever enroll any man without taking some evidence, information, or eliciting knowledge from some source other than the tribal rolls that he was entitled to be enrolled, and it was never permitted to be done; that the purpose was to find out whether a man was entitled to enrollment and one of the factors in that determination was whether he died prior or subsequent to April 1, 1899; that he always ascertained that fact before he enrolled the applicant and always satisfied his mind on that subject by evidence outside of the roll; that every name sent into the Department of the Interior as a name to be enrolled and which had been enrolled as a member of the Creek Tribe had been investigated by some member of the Commission at some place and by evidence outside of the rolls and a determination had been reached that that person was entitled to enrollment; that he undoubtedly satisfied himself from an examination of Thlocco's card whether Thlocco was living on April 1, 1899; that in securing information the Commission had the assistance of the best men in the tribes as well as its own field parties; that when he would take the card he would have the card and the clerk would have the schedule, and he went over it several times with clerks and would find out from the clerk all the information the clerk had with reference to that card several times.

It is true, as set forth in the certificate upon which this case was originally sent here, in view of § 28 of the original Creek Agreement, providing that no person except as therein provided should be added to the rolls of citizenship of the tribe after the date of the agreement, and no person whomsoever should be added to the rolls after the ratification of the agreement, which was ratified on May 25, 1901, that the tribe assembled at Okmulgee,

its capital, some days before that date, for the purpose of considering and acting upon the agreement, and that there was great activity some time before the ratification upon the part of the Dawes Commission and its officers and clerks to complete the enrollment of the tribe; and it is shown that Thlocco's enrollment card was made out at Okmulgee on the twenty-fourth day of May, 1901,— the last day before the ratification of the agreement. It is also true that in the testimony as adduced in this record, there was, as naturally would be the case, a lack of recollection as to the details which attended the enrollment of Thlocco. But there is evidence to which we have already alluded, showing the practice of the Commission to make inquiries and investigations and to ascertain the facts as to the persons enrolled, and that no person was enrolled without information that was deemed satisfactory at that time. The Commission had before it the tribal rolls of 1890 and 1895. The latter roll was made out some six years before the action of the Commission, and in the absence of proof of Thlocco's death or some circumstances to give rise to the conclusion that he was not still living, the Commission might well indulge the presumption that he was still alive. *Fidelity Mutual Life Assn.* v. *Mettler,* 185 U. S. 308, 316.

It is true that the methods followed by the Commission may not have been the most satisfactory possible of determining who were entitled to enrollment as living persons on April 1, 1899, but it must be remembered that there were many persons whose right to enrollment was being considered, and the Commission in good faith made an honest endeavor to keep the names of persons off the rolls who were not entitled to appear as members of the tribe upon the date fixed by Congress. We think the testimony very far from showing such arbitrary action on the part of the Commission in placing Thlocco's name on the rolls as would establish that mistake of law or fact

which is essential to the impeachment of the action of the Commission. This action was brought fourteen years after the enrollment of Thlocco and the allotment to him based on such enrollment should not be disturbed except for good and sufficient reasons.

It is not contended by the Government that the subsequent action of the Secretary in striking Thlocco's name from the rolls had the legal effect to accomplish that purpose. Such is the contention of the intervenors. The testimony shows that Thlocco was enrolled by the Commission on May 24, 1901, that the allotment was made and the certificate therefor issued on June 30, 1902, and that patents were recorded in the office of the Commission on April 11, 1903, the allotment certificate issued in the name of Thlocco. On August 25, 1904, the Commission transmitted to the Secretary of the Interior a communication from the Creek attorney in the nature of a motion to re-open the matter. On September 16, 1904, the Secretary of the Interior ordered further investigation, and directed that notice be given to the heirs of Thlocco of the hearing. The heirs of Thlocco were not found, and no notice was given them of the proposed hearing. On October 10, 1906, the Commission reported that the testimony showed that Thlocco died before April 1, 1899, and recommended that his name be stricken from the roll. On December 13, 1906, the Secretary directed that Thlocco's name be stricken from the roll, and requested the Attorney General to take action to set aside the allotment deeds. We think this action entirely ineffectual to annul the previous action of the Government in placing Thlocco's name upon the roll and issuing in his name the certificate and patents as we have stated. Such action could not be legally taken without notice to the heirs, and was void and of no effect. *Garfield* v. *United States ex rel. Goldsby*, 211 U. S. 249; *Knapp* v. *Alexander-Edgar Lumber Co.*, 237 U. S. 162, 169. In *Lowe* v. *Fisher*, 223

U. S. 95, the Secretary of the Interior in striking names from the roll of Cherokee citizens acted after notice and opportunity to be heard.

The fact that Thlocco was dead at the time deeds were issued in his name would not prevent the title from vesting in his heirs. Section 28 of the Act of March 1, 1901, 31 Stat. 861, 870, provides that "if any such citizen has died since that time [April 1, 1899,] or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly." The effect of this provision is to vest title in the heirs by operation of law. *Skelton* v. *Dill*, 235 U. S. 206, 207, 208.

As to the contention that the lands were not selected by Thlocco, and that he was one of those arbitrarily placed upon the rolls, we think it was within the authority of the Commission to enroll members of the tribe who for any reason refused to make selections; for the statute (§ 3, 31 Stat. 861, 862) provides that "all lands of the said tribe, except as herein provided, shall be allotted among the citizens of the tribe by said commission so as to give each an equal share of the whole in value, as nearly as may be, in the manner following: There shall be allotted to each citizen one hundred and sixty acres of land—boundaries to conform to the Government survey—which may be selected by him so as to include improvements which belong to him." While citizens were thus permitted to make their selections for the purpose of retaining improvements, it seems clear that in case any citizen failed to avail himself of this right it was permissible for the Commission to make the allotment.

We think the District Court rightly ruled that the Government had not offered evidence competent to im-

peach the validity of the Commission's action and thus to invalidate the title subsequently conveyed by the patent to Thlocco with the approval of the Interior Department.

It follows that the decree of the District Court, dismissing the bill, should be

*Affirmed.*

Mr. Justice McReynolds took no part in the consideration or decision of this case.