### UNITED STATES v. LENA et al.

(Circuit Court of Appeals, Eighth Circuit. October 20, 1919.)

#### No. 5311.

INDIANS ⬯13—EFFECT OF ERROR IN ENROLLMENT.

That the Dawes Commission, in listing as a Creek citizen a woman whose name appeared on the Creek rolls of 1895, confused her with another and erroneously gave her the name of her supposed husband, in which name her allotments were made, *held* not to invalidate the patents therefor.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit by the United States against Hettie Lena, alias Emma Coker, and others. Decree for defendants, and complainant appeals. Affirmed.

D. H. Linebaugh, Sp. Asst. Atty. Gen., of Muskogee, Okl. (W. P. McGinnis, U. S. Atty., Alvin F. Molony, Sp. Asst. U. S. Atty., and

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James C. Davis, Creek National Atty., all of Muskogee, Okl., on the brief), for the United States.

N. A. Gibson, of Muskogee, Okl. (J. L. Hull and T. L. Gibson, both of Muskogee, Okl., and Harry H. Rogers, of Tulsa, Okl., on the brief), for appellee Harwell.

Joseph C. Stone, of Muskogee, Okl. (George C. Greer, of Dallas, Tex., B. B. Blakeney and J. H. Maxey, both of Tulsa, Okl., George S. Ramsey and Malcolm E. Rosser, both of Muskogee, Okl., Villard Martin, C. R. Thurwell, and A. A. Hatch, all of Tulsa, Okl., Joseph M. Hill, of Pryor, Okl., and Charles A. Moon and Francis Stewart, both of Muskogee. Okl., on the brief), for appellees Lena and others.

Before SANBORN, Circuit Judge, and MUNGER and YOUMANS, District Judges.

YOUMANS, District Judge. On June 5, 1915, the United States brought this suit in the District Court of the United States for the Eastern District of Oklahoma, in behalf of the Creek Nation of Indians, to set aside two patents, one for a homestead and the other for an allotment, to Emma Coker, a citizen of the Creek Tribe of Indians. The theory of the original bill was that Hettie Lena and Emma Coker were identical, and that the issuance of patents to the latter constituted a duplicate issue.

During the trial an amended bill was filed to meet what the United States conceived to be the effect of the proof. The amended bill charged:

"That the Dawes Commission, after having enrolled on January 26, 1900, Hettie Lena as a citizen of the Creek Nation under her correct name, did, on the 23d and 24th of May, 1901, open an enrolling division and office at Okmulgee, Indian Territory, for the purpose of closing up the Creek Roll; that said Commission to the Five Civilized Tribes at that time, in view of section 28 of the Original Creek Agreement (31 Stat. 861), prohibiting it, or probably prohibiting it, from enrolling, or listing the name of any Creek for enrollment, as a citizen, or adding to said rolls, any name after May 25, 1901, opened an office at Okmulgee, Indian Territory, the capital of the Creek Nation, just a few days before May 25, 1901, and made an effort to list for enrollment before the ratification of said Original Creek Agreement the names of all Creeks not theretofore listed or enrolled, and in said work at Okmulgee said Commission acted hurriedly, and without the opportunity for full investigation, and, acting without evidence in this case, took the name 'Emma' from the 1895 Creek Tribal Roll and placed it on a card for further consideration, and on subsequent consideration rejected that name and the person it represented, and thereupon enrolled a person by the name of Emma Coker, 30 years of age, whose mother was Loskey, and which person complainant alleges was in fact either the same person represented by the name Hettie Lena already enrolled, or represented no person in being on April 1, 1899, or subsequent to that date, and therefore placed the name 'Emma Coker' on the rolls by mistake, although said Hettie Lena had been enrolled prior thereto by the Commission to the Five Civilized Tribes on January 26, 1900; alleges that the said Commission placed upon the rolls the name Emma Coker, under the mistake and belief that the name 'Emma Coker' represented a person in being, to wit, the same person theretofore enrolled by the Commission under the correct name of Hettie Lena, and on account of said confusion in the identity of the names, Hettie Lena and Emma Coker, the name Emma Coker was enrolled by the Commission and approved by the Secretary of the Interior, and on account of the above this complainant did not discover, until a short while before the institution of this suit, that there was in fact and in reality no such person as Emma Coker."

261 F.—10

The testimony shows that the name "Emma," together with other names, appears on the Creek Tribal Roll of 1895 under the name of Loskey. The name Loskey indicated the head of the family or ancestor. Under that name as descendants were eight other names, Sophia, Hettie, Jacob, Lucinda, William, Sallie, Noah and Emma. Mr. Edward Merrick, an employé of the Commission, described the method pursued as follows:

"In March, 1901, the Commission transferred its Creek enrollment work from its office in Muskogee to the town of Okmulgee, the then capital of the Creek Tribe of Indians. I went to Okmulgee in May, 1901, in this work. The object of the Commission in transferring this work to Okmulgee was to secure the enrollment, or the listing for enrollment, of members of the Creek Tribe whose applications the Commission had not received. During the month of May, the Creek National Council was in session at Okmulgee, considering whether the Original Creek Agreement should be ratified. There was a portion of the agreement providing that no person should be added to the rolls of Creek Indians after the ratification of the agreement, and it was thought necessary, in order to preserve or save the rights of Indians, that they should be listed on a card, in some manner to indicate that application had been made for and on their behalf. There were 1,500 or 2,000 names on the 1890 and 1895 rolls for whom no application had been made for enrollment. On May 19th or 20th the Commission was advised that the Creek Council was about ready to act upon the ratification of the agreement, and, in order to get listed upon cards before the council took action, all of the names which were upon the 1890 and 1895 rolls, for whom no application had been made, we took blank census cards, which we had numbered and brought from the Muskogee office, and took these tribal rolls, and made a census card for each name appearing thereon, about whom we had not received information, by placing the name on the census card as it appeared on the tribal roll, and also noting on the card the tribal enrollment, and the band or town in which the name belonged, as it appeared on the tribal roll. I would say there were several hundred names on the tribal rolls about whom the Commission had received no information when we began, the last few days before the action of the Council in ratifying the agreement, writing on the census card the name and tribal enrollment as it appeared on the tribal roll. I think Mr. Hastain and myself wrote most of these cards.

"No arbitrary allotments were made until after the roll had first been approved by the Secretary of the Interior. When the Commission believed an applicant was entitled to enrollment, such applicant was permitted to apply for an allotment immediately after his application for enrollment was received. Thereupon a certificate of allotment was issued, which has the field number of the allottee's census card. When the enrollment was approved by the Secretary of the Interior, patents would be issued to such allottee, which patents had placed on them the number opposite which such allottee's name appeared on the approved roll. * * *

"The name 'Emma' appeared on the 1895 Little River Tulsa 279, unaccounted for, up to May 23, 1901, and she was one among those that we listed on cards to have their names on a card prior to the ratification of the Agreement, in order to preserve any rights she might have. At the time this card was prepared we had absolutely no information with reference to Emma. We did not know whether a person represented by this name was entitled to enrollment, or was living. All we knew was the name appeared on the Little River Tulsa town tribal roll. The expression 'Little River Tulsa town' refers to a clan or band of Creek Indians. The Creek tribe was divided into 47 bands or towns; each was separate from the other, and had separate rolls of its members. I am familiar with the method employed by the Commission in making its recommendations to the Secretary of the Interior for the enrollment of Creeks. We had to secure evidence that the person represented by this name was living on April 1, 1899, before the name would be recommended for enrollment. We also sought information concerning each person, so the enrollment records would

be descriptive of the person enrolled. In this case such information was secured after I entered the name on this card. The notation 'Rewritten' on this card means that the name on this card was placed on another card, together with the information desired by the Commission. The notation 'enrolled as Emma Coker' indicates that the word 'Emma' was placed on another card and given the name Emma Coker. The notation 'Don't find on 1890 roll" indicates the name 'Emma' does not appear on the 1890 Creek tribal roll. The notations appearing on this and other census cards indicate some fact which the Commission ascertained during the progress of its investigations concerning persons represented by the names appearing on the card.  *  *  *

"The instrument identified as Government's Exhibit No. 7 is in the handwriting of Mr. Wm. T. Martin, and is the 'rewritten' card referred to by the notation on Exhibit No. 5. This card is filled out as other census cards were. The notation with reference to residence indicates that the first post-office address of this person was given as Keokuk Falls, and later it was ascertained that her post office was changed to Salem, and was at Salem on April 13, 1912. The number 2974 was placed on this card at the time we prepared the roll. The field number 3274 is the number of the field card. Comparing Exhibits 5 and 7, all information upon No. 7, not appearing on No. 5, was obtained by the Commission, or some employé for the Commission, other than myself, after I had prepared No. 5 at Okmulgee.  *  *  *

"On Exhibit No. 5 I observe in column under the words 'Dawes Roll No.' the word 'Coker' in parenthesis. I do not know who wrote this. It was written after the card was prepared by me. The figures '30' in the column 'age' indicate that the Commission found that the person represented by this name was 30 years old in 1901. Similar information was secured and stated on census cards of all other enrolled Creeks. The 'F' appearing in the column headed 'sex' indicates the Commission found this person to be a female. The word 'full' appearing in column headed 'blood' indicates the Commission ascertained that the quantum of Indian blood of this person was 100 per cent. The tribal enrollment following is identical with what I placed on Government's Exhibit No. 5. The word 'unknown', appearing in column under the word 'father' and the word 'Seminole' following, indicates that some one informed the Commission that the father of this person was unknown, but he was a Seminole Indian. The word 'Loskey' appearing in the column under 'mother' indicates that some one advised the Commission that the mother of this person was named Loskey. The figures '1895' appearing in the column under 'year' indicates that the name of this parent may be found on the 1895 roll, and that she was living on April 1, 1899. If the parent or parents of an enrolled person was found by the Commission to be not living on April 1, 1899, the word 'Dead' would be written opposite the name of the enrolled person, in this column. The letters and word 'L. R. Tulsa,' in the column under the word 'town' refers to the Indian band to which the parent belonged, which was Little River Tulsa."

W. H. Angell testified as follows:

"During part of the year 1901 I was an employé of the Commission to the Five Civilized Tribes, engaged in Creek enrollment work. During that year I was in charge of a field party, sent out into the interior of the Creek tribal domain, making investigations for the Commission concerning unaccounted for names appearing on the Creek tribal rolls. Mr. W. T. Martin was a member of my field party. Government's Exhibit No. 7 was prepared by Mr. Martin, and the information appearing thereon was obtained by the field party of which I had charge. The information we obtained was concerning the woman who was the wife of Charlie Coker, who appeared on card No. 3839. We did not obtain any information or evidence concerning any other person."

Cross-Examination.

"I have some personal recollection as to how this information was obtained, and I do remember how the memorandum happened to be written on the card. I do not remember the persons who appeared before me. Their testimony is

what appears upon the card. Outside of the card, I have no recollection of what evidence I heard. I assisted in investigating between 300 and 400 cases. The facts concerning this particular case have not entirely passed from my memory. I have a distinct recollection of receiving information from a person, and making a memorandum at the time, that 'Emma' was the wife of Charlie Coker. This memorandum which I made was on a memorandum card we had in the field, not on the card which is Government's Exhibit No. 7. That card we did not have in the field. We had thin cards, similar to that, which we took into the field and made our memorandum upon, which thin cards were destroyed when we returned to the office and made the completed card, such as Government's Exhibit No. 7. The members of our party worked together, except in a very few cases, when we had to drive from our camp into the country. I do not remember whether it was a man or a woman that gave testimony that Emma was the wife of Charlie Coker. It was while we were stationed at Wetumka this evidence was received. I could not swear positively to all the places where evidence concerning the enrollment of 'Emma' was heard. I do not think any evidence was heard at Muskogee.

"It is true that Indians from various parts of the Creek Nation, town kings, warriors, and head members of the tribe, and other people who knew about the Creeks, were coming into the office at Muskogee from time to time and corresponding with the Commission with reference to these enrollment matters even in the absence of the field parties. The Commission may possibly have heard evidence at Muskogee while my party was in the field. My recollection is that we made this investigation in July, 1901. We submitted the information we secured to the Commission. I do not know whether there was before the Commission, when they finally enrolled this party, any other evidence than this data we secured and which appears on Government's Exhibit No. 7. We made copies in some cases on thin cards. In some instances we would take the names off the tribal rolls that we were to investigate. In this particular instance, I do not remember whether we had a card, but we did have something to remind us that we were to investigate the name 'Emma,' which appeared opposite No. 279 on the Little River Tulsa Creek roll, and our inquiry was concerning that name. I do not know who wrote the word 'Coker' in lead pencil on Government's Exhibit No. 5."

### Redirect Examination.

"Our party took into the field thin cards and not heavy ones, like the original of Government's Exhibit No. 7. Upon these thin cards we wrote the information we received from the evidence we took. Thereafter it was transferred from the thin cards to the heavy cards, such as the original of Government's Exhibit No. 7, and thereupon the thin card was destroyed."

### Recross-Examination.

"The information I got from some person, either town king or Indian that knew, was that 'Emma' was the wife of Charlie Coker.

"The Court: What Emma was it that you were inquiring about out there? A. We went out to look for Emma; that is the only name.

"The Court: Where did you get that name? A. That we got off of the 1895 pay roll.

"The Court: What was the number on the roll? A. 279, Little River, Tulsa Town.

"The Court: That Emma, 279 Little River Tulsa Town, on the 1895 roll, the person represented by that name, was the person with reference to whom you were making the investigation? A. Yes, sir.

"The Court: And in the course of that investigation you secured evidence to the effect that whom you were investigating was the wife of a man by the name of Coker? A. Charlie Coker; yes, sir. It was after May 23, 1901, that we made our investigation. I do not know when Government's Exhibit No. 7 was prepared. I am satisfied in my own mind when it was prepared, but do not know positively."

.The testimony does not sustain the allegation in the amended bill that the Commission rejected the name and person represented by the name Emma on the 1895 Creek tribal roll. The word "Rewritten," as it appears on the card prepared by or under the direction of Mr. Merrick, does not warrant the conclusion that the investigation with regard to Emma had terminated, and that she was rejected as one having no claim as a Creek citizen. It is clear that in the course of the investigation she was erroneously identified by Mr. Angell, or his party, as the wife of Charles Coker. It developed that Hettie Lena was the wife of Charles Coker, and to that extent there was confusion regarding the two persons, Hettie Lena and Emma; but that confusion did not destroy the identity of Emma as established by the tribal roll of 1895. She was the Emma under investigation by the Dawes Commission, and the patents that were issued were intended for her. The erroneous conclusion of a change of status did not destroy her identity.

The attorney for the United States offered to prove that a child called Emma was at one time in the family of Loskey, and that she was the daughter of Sophia, or granddaughter of Loskey, and that she was born about 1894 and died before she was 2 years old, and that no person named Emma in the family of Loskey was living on April 1, 1899.

Objection was made to that portion of the offer that no person named Emma in the family of Loskey was living April 1, 1899. This objection was sustained by the court and the action of the court is assigned as error. In the case of United States v. Wildcat, 244 U. S. 111, 118, 124, 37 Sup. Ct. 561, 564, 566 (61 L. Ed. 1024), with reference to the action of the Commission, the Supreme Court said:

"A correct conclusion was not necessary to the finality and binding character of its decisions. It may be that the Commission in acting upon the many cases before it made mistakes which are now impossible of correction. This might easily be so, for the Commission passed upon the rights of thousands claiming membership in the tribe, and ascertained the rights of others who did not appear before it, upon the merits of whose standing the Commission had to pass with the best information which it could obtain.    *    *    *

"It is true that the methods followed by the Commission may not have been the most satisfactory possible of determining who were entitled to enrollment as living persons on April 1, 1899; but it must be remembered that there were many persons whose right to enrollment was being considered, and the Commission in good faith made an honest endeavor to keep the names of persons off the rolls who were not entitled to appear as members of the tribe upon the date fixed by Congress."

In the case of Folk v. United States, 233 Fed. 177, 189, 147 C. C. A. 183, 195, Judge Sanborn, speaking for this court, said:

"As the Commission was required by the acts of Congress to give full force and effect to the authenticated tribal rolls, the usages and customs of each tribe, and was by those acts given access to all their rolls and records, the Creek Rolls of 1890 and 1895, on each of which Minnie Atkins and Thomas Atkins as her son were enrolled as citizens of the tribe by blood, constituted not only prima facie, but, in the absence of strong and persuasive countervailing proof, conclusive evidence before the Commission of the right of Thomas Atkins to enrollment as a citizen of the Creek tribe. In the face of this record counsel for the plaintiffs no longer contend in this court, as they pleaded in

the court below, that 'no evidence of any character was produced before, or had or obtained by said Commission with respect to the right of the alleged Thomas Atkins under said act of Congress to be so enrolled'; but they now argue that, although all the evidence and information disclosed above was before the Commission, there was no evidence before them that Thomas Atkins was living on April 1, 1899. The answer is, first, that the testimony of Merrick and Lyons tends to show that Merrick who made the census card had information that he was living before making that card, and made it in reliance upon such information; and, second, that the authenticated Creek roll of 1895 was conclusive evidence that he was living in that year, and, in the absence of any direct evidence before the Commission that he had died, or that he had been in such a dangerous situation that men of reasonable prudence would infer that he had died, prior to April 1, 1899, the conclusive legal presumption was that he continued to live for at least seven years after the making of the Creek roll in 1895, and hence that he was living on April 1, 1899. In the absence of proof of earlier death, or of evidence of unusual danger of such earlier death, the legal presumption is that a live person continues to live for at least 7 years."

The mistake made by the Commission in tracing the identity of Emma in the family of Loskey did not relate to the essential point to be determined, which was whether she was alive on April 1, 1899. The appearance of her name on the 1895 roll was conclusive evidence that she was living in that year, and in the absence of any direct evidence before the Commission that she had died prior to April 1, 1899, the conclusive legal presumption to be drawn by the Commission was that she was alive on that date.

We have considered all of the errors assigned which are regarded as essential to the determination of this case. We do not regard it necessary to consider the numerous other errors assigned. Central Vermont Ry. v. White, 238 U. S. 507, 35 Sup. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252.

In our opinion the decree of the lower court should be affirmed; and it is so ordered.