**THOMPSON, Trustee, v. WILBERN.**

No. 14827—Opinion Filed Sept. 16, 1924.

Rehearing Denied Oct. 14, 1924.

(Syllabus.)

**Indians—Devolution of Cherokee Allotment.**

Alonzo Webber was enrolled by the Commission to the Five Civilized Tribes as a citizen by blood of the Cherokee Nation, along with his mother, Elmira C. Webber, a citizen by blood of the Cherokee Nation. His father, Sam Webber, was enrolled on the Cherokee freedman roll as a person en-

titled to membership in the Cherokee Nation, as a freedman citizen thereof. Alonzo died in infancy, to wit, on December 5, 1903, after having been allotted his proportionate share of the lands of the Cherokee Nation, and at a time when section 2531 of chapter 49 of Mansfield's Digest of the Statutes of Arkansas was in force as governing the devolution of intestates' real estate in the Indian Territory.

Held, that upon the death of said child by reason of said provision of Mansfield's Digest, the mother, through whom the right to enrollment in said tribe was adjudged in favor of the said Alonzo, inherited the entire estate in its allotment.

Error from District Court, Craig County; A. C. Brewster, Judge.

Action by Elmira C. Wilbern, nee Webber, against R. E. Thompson, trustee. Judgment for plaintiff, and defendant brings error. Affirmed.

J. W. Bashore, for plaintiff in error.

T. C. Wilson and Bernard A. Gow, for defendant in error.

BRANSON, J. This is an appeal to reverse the judgment of the district court of Craig county. The parties will be referred to as plaintiff and defendants, as they appeared in the trial court. Elmira C. Webber, nee Wilbern, sued R. E. Thompson, trustee, for a certain tract of land, and for an accounting as to rents and profits. The plaintiff claimed her rights thereto by inheritance. The plaintiff pleaded that she was the mother of one Alonzo Webber, who died December 5, 1903, in infancy, but after being duly enrolled as a citizen by blood of the Cherokee Tribe of Indians, in the Cherokee Nation, now a part of Oklahoma, and after having been allotted land, a part of which the mother seeks to recover herein. The parties stipulated as to the facts as follows, to wit:

"It is hereby stipulated by and between Elmira C. Wilbern, nee Webber, plaintiff, acting by and through her attorney, T. C. Wilson and R. E. Thompson, trustee, defendant, acting by and through his attorney, J. W. Bashore, that the following shall constitute the facts in the above entitled cause:

"(1) That Alonzo Webber was enrolled as a Cherokee citizen opposite Roll No 31,-664; that he died at the age of four years, being on to wit; December 5, 1903: that the land described in plaintiff's petition was allotted to the said Alonzo Webber as a portion of his allotment; that the father of the said Alonzo Webber was one Sam Webber, a duly enrolled Cherokee negro freedman, opposite Roll No. 4132: that the mother of the said Alonzo Webber was Elmira

Webber, a duly enrolled citizen by blood of less than full-blood of the Cherokee Nation.

"(2) That Alonzo Webber was enrolled, together with his mother, as an Indian and was not enrolled with his father as a freedman.

"(3) That the defendant, R. E. Thompson, trustee, is the owner of the interest inherited by Sam Webber, if any.

"(4) That the defendant, R. E. Thompson, trustee, and his immediate grantors have been in possession of said land since October 5, 1908, and have paid all the taxes assessed thereon from said year of 1908 to 1922, both inclusive.

"(5) That Elmira C. Wilbern, nee Webber, is the plaintiff herein, and as the mother of said Alonzo Webber is still the owner of that part of the premises described inherited by her as the mother of said Alonzo Webber, if any.

"(6) That the sale of the interest of the brothers and sisters of Alonzo Webber by guardian to Charles A. Davidson in the allotment described in plaintiff's petition failed to convey any interest therein.

"(7) That the question of amount of rents and taxes is reserved for hearing after determination of above questions of law, at the option of either party to this suit, at the first term of court after decision, as to law, becomes final upon 15 days' notice after the expiration of said term without such determination being asked by either party hereto, the said question shall be deemed to have been waived and decision as to the question of ownership shall be taken as a full determination of the case.

"(8) That the question for decision is:

"1st. Did Sam Webber, the freedman father of Alonzo Webber, inherit a one-half interest in and to the premises described in plaintiff's petition?

"2nd. Is the defendant, R. E. Thompson, as trustee, entitled to a one-half contribution of taxes paid by him from the plaintiff and entitled to have the same declared a lien on the interest of the plaintiff in and to said premises?

"3rd. If R. E. Thompson, trustee, is the owner of the interest of Sam Webber, father of Alonzo Webber, and inherited one-half interest in and to the premises described in plaintiff's petition and if the plaintiff is the owner of the other one-half interest therein, is the said R. E. Thompson as trustee liable to the plaintiff on an accounting for rent?"

From this stipulation it appears that there is no controversy about the facts. Allottee Alonzo Webber was plaintiff's infant child at the time of its death. The plaintiff is a duly enrolled citizen of the Chero-

kee Tribe of Indians, as of Indian blood. The father of said infant allottee was one Sam Webber, who is shown by said stipulation to be a duly enrolled freedman citizen of the Cherokee Nation. Acts of the national Congress, under which the public domain of the Cherokee Tribe theretofore held in common as the property of the tribe was allotted to each duly enrolled citizen or member of the tribe, provided, among other things, that upon the death of a citizen the land should descend according to chapter 49 of Mansfield's Digest of the Statutes of Arkansas.

It has been so often held by the courts. state and federal, that the provision of said chapter 49 of Mansfield's Digest which is more nearly applicable to the character of the title held by the citizens of the respective tribes is that provision thereof (section 2531) as follows:

"In cases where the intestate shall die without descendants, if the estate came by the father, then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as came by the mother, shall ascend to the mother and her heirs. * * *"

It seems to be conceded by the parties that if the right resulting in receipt of the allotment, a part of which is drawn in question in this suit, came to the infant allottee solely by the reason of the mother's citizenship in the Cherokee Nation, then the judgment of the trial court in favor of the plaintiff should be affirmed. But if the right came to him by reason of the membership of both parents in the tribe, the judgment of the trial court was erroneous, and should be reversed.

Long prior to the War between the States, dating from 1861 to 1865, the Cherokees had maintained their tribal entity as a cultured and civilized people of Indian blood. They had held their properties not in severalty, or under individual tenures of ownership. but as a tribal entity. Prior to that time only those of the blood of the tribe (and certain white persons not here necessary to discuss) were recognized by their laws as entitled to tribal privileges. At the close of the said war, however, the history and policy of which it is herein unnecessary to discuss, a treaty was entered into between the said Cherokee Nation and the government of the United States by which, among other things, slavery in the Cherokee Nation was abolished, and former slaves of citizens of that tribe were required to be given the rights of native Cherokees. By its express provisions, this right was limited to such former slaves as were then residing in the Cherokee Nation, or if during the war they had left the Cherokee Nation, that they return thereto prior to February 11, 1867.

Pursuing the policy of allotting the lands in severalty, which was inaugurated by the creation of the Dawes Commission, or the Commission to the Five Civilized Tribes, the object and purpose of which was further effectuated by the act of June 28, 1898, known as the Curtis Bill, and the treaty of July 1, 1902, the making of a final roll of members of the Cherokee Tribe was provided for. Congress at all times recognized by solemn legislative enactments that the rights, whatever they were, which slaves of former Cherokees and their descendants acquired in the Cherokee Nation were acquired by reason of the said treaty of 1866.

The rolls were mainly divided into two classes: One, the roll of citizens by blood; the other, the roll of freedmen citizens. The persons whose names were found on the former roll traced their rights thereto by reason of the blood citizenship of themselves or some ancestor in the tribe. A person enrolled on the freedman roll traced his right to such recognition through the fact that either he or the ancestor through whom he claimed was a former slave of a Cherokee citizen, and that full compliance had been had with the treaty provisions of 1866.

The Commission to the Five Civilized Tribes, known as the Dawes Commission, subject to the right of appeal to the Secretary of the Interior, had the power, judicial in its nature. to determine the right of the citizens of both classes to enrollment on the final rolls of the tribe, and likewise in making such determination, to pass upon the source of that right.

Whether or not Sam Webber was determined by said commission to be entitled to enrollment as a freedman of the Cherokee Nation, we think, makes no difference in the instant case. Under the limitations of the treaty of 1866, he or the ancestors through whom he claimed might have been adjudged not to have complied with said treaty, and he would have had no status as a member of the tribe. It being determined that he was within the class specifically provided for by the said treaty as a freedman did not in any wise add to the rights of the allottee or in any wise aid the Commission to the Five Civilized Tribes in reaching its judgment of enrollment of the infant allottee as a citizen by blood of the

Cherokee Nation, through its mother, the source of its Cherokee blood. The stipulation shows that the mother was a Cherokee Indian by blood, and claimed her right to citizenship in said tribe through her Cherokee blood. And the enrollment judgment of the infant allottee, Alonzo, was a determination that said child was entitled to citizenship in the tribe by reason of the Cherokee blood of its mother. This final enrollment under the treaties carried the incident and accompanying right to a certain tract of land to be selected out of the public domain of the Cherokee Nation. The allotment which followed carried all of the limitations peculiar, under the acts of Congress, to those set apart to Indian allottees. The enrollment status of this child would have been the same had the father been a person not possessing any tribal membership status of any character.

That the enrollment was a judgment behind which the court cannot now go, except for reasons not involved in the instant case, we think is established by the decisions. U. S. v. Bessie Wildcat et al. (U. S.) 61 L. Ed. 1024, and cases therein cited; Page et al. v. Atkins, 86 Okla. 290, 208 Pac. 807; Daniel A. McDougal v. Edmond McKay et al. (U. S.) 59 L. Ed. 1001. That, taken into consideration with the stipulation, shows the rights of this child were determined to come from the mother solely.

The judgment of the trial court is affirmed.

McNEILL, C. J., and NICHOLSON, HARRISON, JOHNSON, MASON, LYDICK, and WARREN, JJ., concur.