## UNITED STATES et al. v. MID–CONTINENT PETROLEUM CORPORATION et al. *

### No. 763.

Circuit Court of Appeals, Tenth Circuit.
Sept. 1, 1933.

*Rehearing denied November 2, 1933.

Jno. M. Goldesberry, U. S. Atty., and Harry Seaton, Asst. U. S. Atty., both of Tulsa, Okl., for the United States.

A. A. Hatch and Gerald B. Klein, both of Tulsa, Okl., and S. L. O'Bannon, E. T. Noble, and A. D. Cochran, all of Okmulgee, Okl., for appellants the Melone Group.

J. M. Springer, of Stillwater, Okl. (David Hervey, of Stillwater, Okl., and Jos. A. Gill, Sr., Jos. A. Gill, Jr., and J. W. Simpson, all of Tulsa, Okl., on the brief), for appellants the Hosey-Guthrie Group.

Jos. C. Stone, of Muskogee, Okl. (Grant Foreman, of Muskogee, Okl., and J. D.

Simms, of Wewoka, Okl., on the brief), for appellants the Jesse Group.

John S. Severson, of Tulsa, Okl. (Herbert Smith, of Okmulgee, Okl., on the brief), for appellants the Tolon Group.

Chas. B. Rogers, of Tulsa, Okl. (E. O. Patterson, of Tulsa, Okl., on the brief), for appellants the Edwards-Gambler Group.

Lafayette Walker, of Okmulgee, Okl. (John Caruthers, of Okmulgee, Okl., on the brief), for appellants the Wolf Group.

N. A. Gibson, R. H. Wills, and John Rogers, all of Tulsa, Okl. (J. C. Denton and Jos. L. Hull, both of Tulsa, Okl., on the brief), for appellees.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

This suit involves the title to 160 acres of land in Creek County, Oklahoma, which was allotted to Ullie Eagle, a full-blood member of the Creek Tribe of Indians, who died intestate on June 8, 1902. In the trial court fourteen separate groups of parties claimed title to such land, as or through alleged heirs of Ullie Eagle. The primary question presented is, who were her heirs at law.

I. A History of the Litigation.

On November 2, 1923, Harriett Hosey and others, herein referred to as the Hosey Group, brought an action in the district court of Creek County, Oklahoma, against James A. Chapman and others. In their petition, the Hosey Group alleged that such land was allotted to Ullie Eagle; that she died intestate on June 8, 1902; that she left as her sole surviving heir Patience DePriest; that they were the heirs of Patience DePriest and entitled to such land; that the defendants were in possession of such land; that such land was valuable for oil and gas, and that the defendants had appropriated the rents, royalties, and profits arising from such land and from the oil and gas produced therefrom. They prayed for the possession of the land, and for damages and mesne profits in the sum of twenty-five million dollars.

The Guthrie Group, now aligned with the Hosey Group, with leave of court filed a cross-petition in which they alleged that Patience DePriest and John Strickland were all of the heirs of Ullie Eagle, and that the Guthrie Group were entitled to an undivided one-half interest in such land as the heirs of John Strickland. They prayed that they be adjudged the owners of an undivided one-half interest in the land, and have judgment for joint possession with the Hosey Group, and for one half of the damages and mesne profits.

The Melone Group with leave of court intervened and filed an answer and cross-petition in which they alleged that they were the sole heirs of Ullie Eagle, and were the owners of and entitled to the possession of such land. They prayed that they be adjudged the owners of such land, and that their title be quieted as against the Hosey Group, and for general equitable relief.

The Monahwee Group with leave of court intervened and filed an answer and cross-petition in which they set up that they were the heirs of Ullie Eagle and entitled to such land.

The Hosey Group made no objection to the Guthrie, Melone, and Monahwee Groups becoming parties to the action and filing their several cross-petitions. Issues were joined by appropriate pleadings filed by the several parties. These pleadings raised both legal and equitable issues. An accounting for the rents, issues, and profits was sought against the defendants by each of the other groups.

A jury trial resulted in a verdict in favor of the Hosey-Guthrie Group. Under instructions of the court the jury returned an additional verdict for the defendants against the Melone Group. On March 6, 1926, the court set aside the verdict in favor of the Hosey-Guthrie Group, and granted defendants and the Monahwee Group a new trial.

On May 3 and 4, 1926, respectively, the state court entered orders permitting the Holly Lewis Group and the George Washington Scott Group to intervene in the action.

On May 10, 1926, Sally Tolon with leave of court intervened and filed a cross-petition in which she alleged that she was the sole heir of Ullie Eagle, the owner of such land and entitled to the immediate possession thereof; and that the claims of certain parties to the action constituted clouds on her title. She prayed that she be decreed to be the owner of such land and entitled to the possession thereof, and for an accounting for mesne profits.

On June 16, 1926, the defendants filed a motion for an order making the Mid-Continent Petroleum Corporation and the Magnolia Petroleum Company parties defendant, and making certain other named persons claiming title to such land parties to the ac-

tion, and granting leave to the defendants to file a cross-petition for a determination of the heirs of Ullie Eagle, and for the quieting of the title to such land in the defendants. The court granted the motion.

On the same day the Mid-Continent Corporation and the other defendants filed their cross-petition in which they alleged that Ullie Eagle died intestate on or about June 8, 1902; that such land was selected and allotted to her and patents therefor issued; that the Mid-Continent Corporation was the owner of an oil and gas lease covering 60 acres of such land, and that defendants, Rogers, Faulkner, Stephens, and Long were the owners of such 60 acres subject to such lease; that the Magnolia Company and the Prairie Oil & Gas Company were the owners of oil and gas leases covering the remaining 100 acres of such land, and that Montfort Jones was the owner of such 100 acres subject to such leases; that the plaintiffs and interveners and a large number of other persons were claiming some right, title, interest or estate in and to such land adverse to the defendants; that such claims were unfounded in law and in equity, and constituted clouds upon the title of the defendants, and that such plaintiffs, interveners, and other persons would continue, unless restrained from so doing, to assert such adverse claims to the great and irreparable injury of the defendants, and that the heirs of Ullie Eagle had never been judicially determined. It prayed that the heirs of Ullie Eagle be determined; that the defendants be adjudged to be the absolute owners of such land and entitled to the possession thereof; that their title be quieted, and that the plaintiffs and interveners be enjoined from claiming and asserting any right, title, interest, or estate in such land.

On July 16, 1926, in accordance with section 3 of the Act of Congress of April 12, 1926 (44 Stat. 240), set out in marginal Note [1], the Mid-Continent Corporation and the Magnolia Company executed a notice addressed to the United States and the superintendent of the Five Civilized Tribes in which they set up that the Mid-Continent Corporation and the Magnolia Company on June 16, 1926, had entered their appearance and filed a cross-petition in such cause, and that at least the following named parties defendant or intervener, Katie Harjo, Legus Harjo, Isla Wolf, Katie Sims née Scott, Nepsy Jones née Turk, Lena Johnson, Joseph Johnson, Lizzie Tiger née Gambler, Martin Gambler, Julia Adams, George West, Louina Gray, and Katie Grayson were restricted members of the Five Civilized Tribes of Indians in Oklahoma, and that each of them claimed some right, title, interest, or estate in and to such land; and that such land had been allotted to Ullie Eagle, who was duly enrolled opposite Roll No. 4338 as a member of the Creek Tribe of Indians, and attached thereto a true, complete, and correct transcript and copy of the pleadings on file

[1] "Any one or more of the parties to a suit in the United States courts in the State of Oklahoma or in the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervenor, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear in said cause within twenty days thereafter, or within such extended time as the trial court in its discretion may permit, and after such appearance or the expiration of said twenty days or any extension thereof the proceedings and judgment in said cause shall bind the United States and the parties thereto to the same extent as though no Indian land or question were involved. Duplicate original of the notice shall be filed with the clerk of the court in which the action is pending and the notice shall be served on the Superintendent for the Five Civilized Tribes or, in case of his absence from his principal office, upon one of his assistants, and shall be served within ten days after the general appearance in the case of the party who causes the notice to be issued. The notice shall be accompanied by a certified copy of all pleadings on file in the suit at the time of the filing of the duplicate original notice with the clerk and shall be signed by the party to the action or his or her counsel of record and shall be served by the United States marshal and due return of service made thereon, showing date of receipt and service of notice. If notice is not served within the time herein specified, or if return of service thereof be not made within the time allowed by law for the return of service of summons, alias notices may be given until service and return of notice is had and in no event shall the United States be bound unless written notice is had as herein specified: Provided, That within twenty days after the service of such notice on the Superintendent for the Five Civilized Tribes or within such extended time as the trial court in its discretion may permit the United States may be, and hereby is, given the right to remove any such suit pending in a State court to the United States district court by filing in such suit in the State court a petition for the removal of such suit into the said United States district court, to be held in the district where such suit is pending, together with the certified copy of the pleadings in such suit served on the Superintendent for the Five Civilized Tribes as hereinbefore provided. It shall then be the duty of the State court to accept such petition and proceed no further in said suit. The said copy shall be entered in the said district court of the United States within twenty days after the filing of the petition for removal and the defendants and intervenors in said suit shall within twenty days thereafter plead, answer, or demur to the declaration or complaint in said cause, and the cause shall then proceed in the same manner as if it had been originally commenced in said district court, and such court is hereby given jurisdiction to hear and determine said suit, and its judgment may be reviewed by certiorari, appeal, or writ of error in like manner as if the suit had been originally brought in said district court."

in the cause. This notice was served on the superintendent by the United States marshal for the Eastern District of Oklahoma on June 22, 1926.

On July 8, 1926, the state court entered an order granting the United States thirty days additional time to petition for the removal of such cause under section 3, supra.

On August 4, 1926, the United States filed its petition to remove such cause, wherein it alleged that on June 16, 1926, the Mid-Continent Corporation and the Magnolia Company had entered their general appearance in such cause and filed a cross-petition; that the following named parties defendant or intervenor, Katie Harjo, Isla Wolf, Katie Sims née Scott, Nepsey Jones née Turk, Lena Johnson, Legus Harjo, Lizzie Tiger née Gambler, Martin Gambler, Julia Adams, George West, Katie Grayson, and Louina Gray, were restricted members of the Five Civilized Tribes of Indians, and that each of them claimed some right, title, interest or estate to such land, and that such land had been allotted to Ullie Eagle, a duly enrolled member of the Creek Tribe of Indians; that the action was for ejectment, for the recovery of mesne profits, and to quiet title to such land; that within ten days after their general appearance in such cause the Mid-Continent Corporation and the Magnolia Company had given the notice above referred to; that the same was served on June 22, 1926; that on July 8, 1926, the court had granted an extension of time for the United States to petition the removal of such action, and that the United States desired to have such cause removed to the United States District Court for the Northern District of Oklahoma.

On August 4, 1926, the state court entered an order of removal.

Thereafter the Edwards, Gambler, and Jesse Groups were permitted to intervene and file their answers and cross-petitions.

On September 10, 1926, the Hosey Group filed a motion to remand the cause to the state court. This motion was denied on September 14, 1926. Thereafter the Hosey Group filed a motion to strike the cross-petition of the defendants, and the answers and cross-petitions of the several groups who had intervened in the cause. These motions were denied on January 4, 1927.

On March 12, 1927, the trial court transferred the cause from the law to the equity docket for a trial on the equitable issues in advance of the legal issues, denied the demand of the Hosey Group for a jury trial of the legal issues in advance of the trial of the equitable issues, and referred the cause to a special master to settle the pleadings, and to take the evidence and report the same, together with his findings of fact and conclusions of law to the court.

On August 11, 1927, the United States filed a bill in the nature of an original bill, in behalf of all parties to the cause who were restricted members of the Five Civilized Tribes.

On September 19, 1927, the Wolf Group with leave of court intervened and filed their answer and cross-petition.

The issues were duly joined and the equitable issues heard before the special master. On November 12, 1928, the special master filed his report, together with his findings of fact and conclusions of law. The master found that Ullie Eagle was the daughter of David Eagle and Tochee; that Tochee was the daughter of Sundulla or Cundulla Fixico, and Sechehoye; that Sechehoye died while Tochee was an infant, and thereafter Fixico married Lydia; that Nellie Fish was the daughter of Fixico and Lydia, and was living at the death of Ullie Eagle; that Nellie Fish was the nearest of surviving kin to Ullie Eagle; and that Katie Bear was the sister of Sechehoye. He concluded that Nellie Fish was the sole surviving heir of Ullie Eagle, and inherited all of her property.

Defendants claim through mesne conveyances from Nellie Fish and Katie Bear.

On April 22, 1929, the United States filed an amended bill in which it alleged that the Melone Group were the nearest of kin to Ullie Eagle. Theretofore it had appeared in behalf of all restricted members of the Five Civilized Tribes who claimed as heirs of Ullie Eagle.

On January 22, 1931, the Federal court overruled the exceptions to the master's report, made special findings of fact and conclusions of law in which it confirmed the findings and conclusions of the special master, and entered a decree as prayed for in defendants' cross-petition.

The Melone, the Hosey-Guthrie, the Jesse, the Edwards-Gambler, the Wolf, and the Tolon Groups have appealed.

Certain other groups joined in the appeal originally, but have not prosecuted them.

II. The Rule Governing Appeals in Equity.

We shall proceed to a consideration of the questions here presented, mindful of the well-settled rule that findings of fact made

by a master upon conflicting evidence, confirmed by the trial court and a decree entered thereon, are presumptively correct, and that unless an obvious error of law has intervened or a serious mistake of fact has been made, the decree should be permitted to stand. Staley v. Dwyer (C. C. A. 8) 29 F.(2d) 982, 984; Fienup v. Kleinman (C. C. A. 8) 5 F.(2d) 137; Crawford v. Briant (C. C. A. 10) 53 F.(2d) 754, 757; Clarke v. Hot Springs E. L. & P. Co. (C. C. A. 10) 55 F.(2d) 612, 615; New York Life Ins. Co. v. Griffith (C. C. A. 10) 35 F.(2d) 945, 946; Commercial Nat. Bank v. Stockyards Loan Co. (C. C. A. 8) 16 F.(2d) 911, 913; Silver King Coalition Mines Co. v. Silver King C. M. Co. (C. C. A. 8) 204 F. 166, Ann. Cas. 1918B, 571.

III. The Jurisdiction of the Federal Court.

■ The Hosey-Guthrie Group contend that the case was improperly removed, and that the Federal court is without jurisdiction.

They assert that on the death of Ullie Eagle the land in question ceased to be restricted, and therefore that no restricted member of the Five Civilized Tribes in Oklahoma, or restricted heir or grantee of such Indian was party as "plaintiff, defendant, or intervener * * * claiming * * * title to or an interest in lands allotted to a citizen of the Five Civilized Tribes." It was alleged in the notice and in the petition for removal that a large number of persons who were either parties defendant or interveners were restricted members of the Five Civilized Tribes and claimed some right, title, and interest in such land. This allegation is not challenged either by pleading or proof. At the time of the filing of the petition for removal, Lizzie Tiger née Gambler, and Isla Wolf were parties to the action. The notice and petition for removal alleged that they were restricted members of the Five Civilized Tribes. The proof shows that both were enrolled full-blood citizens of the Creek Tribe. Lands passing to full-blood heirs remain under qualified restrictions by virtue of section 9 of the Act of May 27, 1908 (35 Stat. 312, 315); Parker v. Richard, 250 U. S. 235, 39 S. Ct. 442, 63 L. Ed. 954; United States v. Gypsy Oil Co. (C. C. A. 8) 10 F.(2d) 487; Holmes v. United States (C. C. A. 10) 53 F. F.(2d) 960. Thus it will be seen that there were parties to the action who were clearly within the class designated in section 3, supra.

The Hosey-Guthrie Group assert that section 3, supra, does not of itself give a Federal court jurisdiction on removal, but that other independent grounds of Federal jurisdiction must exist. Such a construction is contrary to the express terms of section 3, supra, and would make the removal provision thereof superfluous and useless.

We adhere to our conclusions reached in Fish v. Kennamer (C. C. A. 10) 37 F.(2d) 243, where we held this action was properly removed.

IV. Certain Procedural Questions.

■ The Hosey-Guthrie Group contends that the court erred in refusing to strike the cross-petitions. In their petition they set up two causes of action, one at law in ejectment; and the other for recovery of mesne profits, equitable in its nature. Wythe v. Myers, 30 Fed. Cas. 766, No. 18,119; Pengra v. Munz (C. C. Or.) 29 F. 830; Larned v. Hudson, 57 N. Y. 151.

The applicable Oklahoma statutes are sections 219, 224, 225, and 466, C. O. S. 1921, and are set out in marginal Note [2].

In those jurisdictions where the code system of pleading prevails, a defendant in ejectment who is in possession of the land, where affirmative relief is needed to establish his title or where for some other reason he has no adequate remedy at law, may set up an equitable counter-petition or cross-bill to quiet title. People of Porto Rico v. Livingston (C. C. A. 1) 47 F.(2d) 712; Wehrman v. Conklin, 155 U. S. 314, 15 S. Ct. 129, 39 L. Ed. 167; Lawson v. U. S. Mining Co., 207 U. S. 1, 28 S. Ct. 15, 52 L. Ed. 65; Martin v. Molera, 4 Cal. App. 298, 87 P. 1104; Rucker v. Steelman, 73 Ind. 396; Emily v. Harding, 53 Ind. 102.

[2] "219. Joinder of parties defendant.

Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein."

"224. Necessary parties to be brought in.

"The court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in."

"225. Interested party joined on petition.

"When, in an action for the recovery of real or personal property, any person having an interest in the property applies to be made a party, the court may order it to be done."

"466. Action to quiet title—Joinder.

"An action may be brought by any person in possession, by himself or tenant, of real property against any person who claims an estate or any interest therein adverse to him for the purpose of determining such adverse estate or interest, and such action may be joined with an action to recover possession of such real property by any person not in possession."

When the cross-petition was filed herein by the defendants, it had not been judicially determined who were the heirs of Ullie Eagle. Such a determination was necessary to establish defendants' title.

Furthermore defendants in possession were confronted with many persons asserting conflicting claims of title to such land. Defendants under such circumstances were entitled, in order to avoid a multiplicity of suits, to file an equitable cross-petition to quiet title against all such persons, and to require them to set up and litigate their claims in one suit. We so held in Fish v. Kennamer, supra. See authorities there cited.

Defendants' cross-petition was a proper pleading in the state court under section 466, supra. It was likewise a proper pleading in the Federal court under section 398, 28 US CA, which provides for equitable defenses and equitable relief in actions at law.

We conclude that both under section 466, supra, and section 398, supra, the defendants, having no adequate remedy at law, had a right to file their cross-petition to quiet title.

The intervening petitions were proper pleadings to defendants' cross-petition. Upon the filing of the intervening petitions in the state court, defendants' cross-petition and those filed by others became proper pleadings thereto. Whether such intervening petitions were properly filed is immaterial, because the Hosey-Guthrie Group raised no objection thereto until long after the filing of defendants' cross-petition.

New parties may be brought in when necessary for the determination of issues properly raised by an equitable cross-petition filed in an ejectment action. City of Eureka v. Gates, 120 Cal. 54, 52 P. 125; Klinker v. Schmidt, 106 Iowa, 70, 75 N. W. 672.

It is well settled that when an equitable defense is interposed to an action at law in a Federal court, the cause should be transferred to the equity docket, and the equitable issues first disposed of as in a court of equity; then, if any issue at law remains, transferred to the law docket for trial by jury. Liberty Oil Co. v. Condon Nat. Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232; American Mills Co. v. American Surety Co., 260 U. S. 360, 43 S. Ct. 149, 67 L. Ed. 306; Fish v. Kennamer (C. C. A. 10) 37 F.(2d) 243; Home Ins. Co. v. Sullivan Mach. Co. (C. C. A. 10) 64 F.(2d) 765.

We therefore hold that the trial court properly denied the motions to strike, and properly tried the equitable issues in advance of the issues of law.

## V. The Admissibility and Effect of Certain Evidence.

The enrollment records of various Indians made by the Dawes Commission and certain tribal rolls were admitted in evidence. In the briefs divergent views are expressed as to the admissibility and effect of such records as evidence. Evidence of declarations, tradition, and reputation as to pedigree was introduced, and its admissibility is also challenged by certain groups.

By the Curtis Act of June 28, 1898 (30 Stat. 495, 502, 503), the Dawes Commission was authorized and directed to make correct rolls of the citizens by blood of the Creek Tribe, eliminating from the tribal rolls such names as had been placed thereon by fraud or without authority of law, and to enroll only such citizens as had lawful right thereto and their descendants born after such rolls were made. The Curtis Act also directed such commission to make a roll of the Creek Freedmen. It further directed that such commission should make such rolls descriptive of the persons placed thereon, so that they might be thereby identified. Section 28 of the Creek Agreement (31 Stat. 861, 870) provided that all citizens living on the first day of April, 1899, and entitled to be enrolled under the provisions of the Curtis Act, should have their names placed upon such rolls.

The Dawes Commission was a quasi-judicial tribunal whose judgments, within the limits of its jurisdiction, are subject to attack only as judgments of courts are, for fraud or mistake. United States v. Wildcat, 244 U. S. 111, 118, 37 S. Ct. 561, 61 L. Ed. 1024; Campbell v. Wadsworth, 248 U. S. 169, 39 S. Ct. 63, 63 L. Ed. 192; United States v. Atkins, 260 U. S. 220, 43 S. Ct. 78, 67 L. Ed. 224.

But its findings are conclusive only as to those matters which it was authorized and directed to investigate and determine. They are not conclusive upon matters which came under its consideration only collaterally or incidentally, such as age, sex, an alias, and the like. Norton v. Larney, 266 U. S. 511, 45 S. Ct. 145, 148, 69 L. Ed. 413; Malone v. Alderdice (C. C. A. 8) 212 F. 668, 670. Note [3].

[3] In Norton v. Larney, supra, in considering the effect of the enrollment records made under the Act of March 3, 1905 (33 Stat. 1048, 1071), the court said:

■ The recital on the rolls as to the exact age of an Indian was merely a descriptive or identifying circumstance. As to such facts, except in the cases falling within the purview of section 3 of the Act of May 27, 1908 (35 Stat. 313), hereinafter to be considered, it was a recital of a fact only collaterally or incidentally involved, and not conclusive in character.

Section 3, supra, in part reads as follows: "That the rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes and of no other persons to determine questions arising under this Act and the enrollment records of the Commissioner to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizen or freedman."

Ullie Eagle died June 8, 1902, and the descent of her property was cast on that date. The rights of her heirs then accrued. A finding by the Dawes Commission as to the age of an enrolled citizen is not conclusive against parties whose rights accrued prior to the enactment of section 3, supra. Malone v. Alderdice, supra; Phillips v. Byrd, 43 Okl. 556, 143 P. 684; Scott v. Brakel, 43 Okl. 655, 143 P. 510. Note [4].

We therefore conclude that the findings of the Dawes Commission with reference to the ages of various Indians, as set forth in the rolls of that commission introduced in evidence, are not conclusive in this case.

■ Official records or documents kept or prepared by a person whose public duty it is to truly record the facts stated therein, are admissible as prima facie evidence of such facts. Evanston v. Gunn, 99 U. S. 660, 666, 25 L. Ed. 306; Runkle v. United States (C. C. A. 10) 42 F.(2d) 804; McInerney v. United States (C. C. A.) 143 F. 729, 737; Wigmore on Evidence (2d Ed.) vol. 3, § 1639. The enrollment records made by the Dawes Commission were such records. They were made by members of a quasi-judicial tribunal created by Congress, whose duty it was to determine and truly record the facts therein set forth, and even as to collateral and incidental matters they are prima facie evidence of the facts stated therein. Page v. Atkins, 86 Okl. 290, 208 P. 807, 818; Halsell v. Beartail, 107 Okl. 103, 227 P. 392. Note [5].

■ The tribal rolls were also admissible. They were made by an officer of the Creek Nation whose duty it was to truly record the facts stated therein; and they are prima fa-

---

[4] "The issues to be determined by the Commissioner are found in the act of Congress already quoted. A reading of that act demonstrates that the material facts to be found and, consequently, those alone which the findings of the Commissioner conclusively establish, are that the child was born between May 25, 1901, and March 4, 1905; that he was living on the latter date; and that his parents were citizens of the Creek Tribe of Indians whose enrollment had been approved by the Secretary of the Interior prior to the date of the approval of the act. Inquiry as to whether the parents of the child were known by other names, and, if so, what those names were, as well as the precise numbers under which they were enrolled, was incidental or collateral to the direct issue presented by the statute, which was, Were they enrolled with the approval of the Secretary of the Interior at the proper time? Recitals in respect of such matters or of other merely identifying circumstances such as the exact age of the child, its sex, etc. (Hegler v. Faulkner, 153 U. S. 109, 117, 118, 14 S. Ct. 779, 38 L. Ed. 653; Malone v. Alderdice, 212 F. 668, 129 C. C. A. 204; United States v. Lena (C. C. A.) 261 F. 144; 149, 150; Porter v. United States, 260 F. 1, 4, 171 C. C. A. 37) are not conclusive in subsequent proceedings about the same subject-matter. The principle of res judicata does not apply to points which come under consideration only collaterally or incidentally."

[4] In Malone v. Alderdice, supra, the court said:

"The Commission to the Five Civilized Tribes which made the enrollment of their citizens and freedmen was a quasi judicial tribunal empowered to determine who should be enrolled and what lands should be allotted and in what way it should be allotted to every citizen and freedman, and its adjudication of these questions and of every issue of law and fact that it was necessary for it to determine in order to decide these questions is conclu-

sive and impervious to collateral attack. But its determination, recital, or report regarding issues not material to its answers to the questions who should be enrolled and what lands should be allotted to them and how, is, in the absence of special legislation such as the act of May 27, 1908, without judicial or other conclusive effect. Kimberlin v. Commission to Five Civilized Tribes, 104 F. 653, 662, 44 C. C. A. 109, 118. * * *

"And our conclusion is that the Commission to the Five Civilized Tribes had no jurisdiction in making its enrollment of their citizens and freedmen to determine and conclusively adjudge their respective ages. The result is that in the determination of rights which accrued and of the effect of proceedings which were concluded prior to May 27, 1908, the enrollment records of the Commission are not conclusive evidence of the age of any Indian citizen or freedman."

[5] In Page v. Atkins, supra, the court said:

"It is clear from a consideration of the various acts of Congress why the Commission to the Five Civilized Tribes adopted the system of making a census card for each citizen admitted to citizenship. This card is, in effect, a description of a citizen which the Commission has adjudicated was entitled to be enrolled upon the final approved rolls of the Commission as a citizen of one of the Five Civilized Tribes. The information furnished on this card, such as the sex, age, and parentage of the citizen, is descriptive matter, and there may appear an error as to one or more of these descriptive words which would not destroy the identity of the citizen. But, considering the fact that these descriptive words were placed upon this record pursuant to a statutory duty as a matter of evidence, they are entitled to great weight, and cannot and will not be discredited or ignored in the absence of strong and convincing evidence to the contrary. In determining the identity of a citizen from the enrollment record, it is the duty of the court to consider the entire record."

cie evidence of such facts.  Evanston v. Gunn, supra; Fowler v. Scott, 64 Wis. 509, 25 N. W. 716; Newman v. Doe, 4 How. (Miss.) 522, 554, 555.

■ Evidence of declarations, tradition, and reputation is admissible to prove facts as to genealogy or pedigree. Fulkerson v. Holmes, 117 U. S. 389, 397, 6 S. Ct. 780, 29 L. Ed. 915; Vezina v. United States (C. C. A. 8) 245 F. 411; George v. United States, 1 Okl. Cr. 307, 97 P. 1052, 100 P. 46; In re Hurlburt's Estate, 68 Vt. 366, 35 A. 77, 35 L. R. A. 794; Grand Lodge, A. O. U. W. v. Bartes, 69 Neb. 631, 96 N. W. 186, 98 N. W. 715, 111 Am. St. Rep. 577; In re Pickens' Estate, 163 Pa. 14, 29 A. 875, 25 L. R. A. 477; Geisler v. Geisler, 160 Minn. 463, 200 N. W. 742; Lincoln Reserve Life Ins. Co. v. Morgan, 126 Ark. 615, 191 S. W. 236; Turner v. Person, 175 N. C. 219, 95 S. E. 362, L. R. A. 1918D, 1082; McLain v. Woodside, 95 S. C. 152, 79 S. E. 1.

■ Proof of pedigree embraces age,[a] death,[b] descent,[c] heirship,[d] issue or want of issue,[e] legitimacy and illegitimacy,[f] marriage,[g] name,[h] parentage,[i] relationship,[j] and degree thereof.[k]

■ The only competent declarants are persons *related by blood or affinity to the* family, the pedigree of which is in issue. Fulkerson v. Holmes, 117 U. S. 389, 397, 6 S. Ct. 780, 29 L. Ed. 915; In re McDade's Estate, 95 Okl. 120, 218 P. 532.  Slight proof of such relationship is sufficient, since the relationship of the declarant with the family might be as difficult to prove as the main fact sought to be established.  Fulkerson v. Holmes, supra.  This limitation does not apply however where the witness knows the

facts of his own knowledge gained through intimate acquaintance with such family. The evidence of such a witness, as to his knowledge of facts so acquired, is not hearsay.  Neustadt v. Coline Oil Co., 141 Okl. 113, 284 P. 52.

■ As a general rule proof of such reputation and tradition should be limited to reputation and tradition in the family, the genealogy of which is under inquiry.  In re Heaton's Estate, 135 Cal. 385, 67 P. 321; Dussert v. Roe, Fed. Cas. No. 4200; Haddock v. Boston & Maine R., 3 Allen (Mass.) 298, 81 Am. Dec. 656; In re Hurlburt's Estate, 68 Vt. 366, 35 A. 77, 35 L. R. A. 794.  Under exceptional circumstances however proof of reputation among friends and acquaintances, or neighborhood reputation, is admissible.  Note [6].

---

(a) Grand Lodge, A. O. U. W. v. Bartes, 69 Neb. 631, 96 N. W. 186, 98 N. W. 715, 111 Am. St. Rep. 577; Jaffe v. Deckard (Tex. Civ. App.) 261 S. W. 390; Lincoln Reserve Life Ins. Co. v. Morgan, supra.

(b) Turner v. Person, supra; In re Hurlburt's Estate, supra.

(c) Rawles v. Bazel, 141 Va. 734, 126 S. E. 690.

(d) In re Pickens' Estate, supra; Hoyt v. Lightbody, 98 Minn. 189, 108 S. W. 843, 116 Am. St. Rep. 358, 8 Ann. Cas. 984.

(e) Washington v. Bank for Savings, 171 N. Y. 166, 63 N. E. 831, 89 Am. St. Rep. 800.

(f) Geisler v. Geisler, supra; Rollins v. Wicker, 154 N. C. 559, 70 S. E. 934.

(g) Vezina v. United States, supra; Hubatka v. Maierhoffer, 81 N. J. Law, 410, 75 A. 346; Rollins v. Wicker, 154 N. C. 559, 70 S. E. 934.

(h) Hoyt v. Lightbody, 98 Minn. 189, 108 N. W. 843, 116 Am. St. Rep. 358, 8 Ann. Cas. 984.

(i) Smith v. McDowell (Tex. Civ. App.) 240 S. W. 563; Hubatka v. Maierhoffer, 81 N. J. Law, 410, 75 A. 346.

(j) McLain v. Woodside, supra; Smith v. McDowell, supra; Rawles v. Bazel, supra.

(k) Smith v. McDowell, supra; Rawles v. Bazel, supra.

[6] Mr. Wigmore in his work on Evidence (2d Ed.) vol. 3, § 1605, says:
"In communities of more primitive conditions where social life continues stable amid constant and fixed surroundings, the *neighborhood-reputation* is unquestionably of some value.  Such was formerly the almost universal state of things in England, on the Continent, and in the United States. Such is still the state of things in rural communities almost everywhere (except in newly-settled regions), notably in the small towns.  That it has ceased to exist in the metropolitan communities does not indicate that neighborhood-reputation, where it arises, is less trustworthy; it merely indicates that amid the gregarious individualism and domiciliary mutations of the metropolitan horde no neighborhood-reputation is likely to exist.  Moreover, the frequent migrations in American domestic life have in one respect made reputation-evidence even more necessary than in stable communities as a source of knowledge; for in *countless families the only* means of knowledge for them of the career of their migrated members is the reports brought back, at times, *of the fate or fortune reputed to have overtaken them in the distant community* where they took up a new home.  In the typical cases coming before the courts, where, for example, one who was in California with John Doe, who emigrated from New England in 1850, testifies that Doe was commonly reputed in *Sandy Gulch to have been killed* in a brawl and to have been then and there buried, does not this serve to support belief?  If it is the fear of imposition that stands in the way, would it not be equally possible to procure some perjurer to come from California and tell upon the stand a concocted story about the death of Doe as witnessed by him?  *It is not a question of absolute* proof; it is a question of the admissibility of a single piece of evidence, which may or may not prove to be sufficient.  It seems finical to exclude from all consideration whatever, in a legal investigation, a class of evidence which is not only much relied upon in practical affairs, but is also sufficiently within the general principle of two exceptions (Reputation and Family History) to the Hearsay rule.
"Such evidence was once in England considered orthodox enough; and its use has been vindicated, on grounds of policy and of principle, by many American courts, as admissible in certain classes of cases."
He cites in support of the text the following decisions:  Vaughan's Trial, 13 Howell, St. Tr. 485, 509, 512;  Lindsay's Trial, 14 Howell, St. Tr. 987, 996;  Francia's Trial, 15 Howell, St. Tr. 897, 962;  Duke of Hamilton's Trial, 4 Howell, St. Tr. 1155, 1170;  Morewood v. Wood, 14 East 330;  Birney v. Hann,

The Five Civilized Tribes were a primitive people. They made few if any records of marriages, births, and deaths. They were moved several times to new localities. Prior to 1881 (Note [7]), and in many instances thereafter, marriage and divorce were informally effected by simple agreement of the parties. Divorce was frequent. Illegitimate children were common. Due to these circumstances, the only proof available as to genealogy, in many instances, is that of family and neighborhood tradition and reputation.

The tribal rolls and the rolls of the Dawes Commission were necessarily made from declarations of members of the families of the Indians involved, and family and neighbor-

hood tradition. They were findings of official bodies. The tribal rolls were made by administrative officials of the tribe, charged with that duty. The final rolls were made by the Dawes Commission, a quasi-judicial tribunal created by Congress, acting under authority given by the Curtis Act. The findings of such officials are more persuasive than mere evidence of reputation. Note [8].

We conclude therefore that such official rolls and records, and, under the peculiar circumstances surrounding these Indians, such evidence of family and neighborhood tradition and reputation were admissible.

However we are of the opinion that if such evidence were restricted to reputation in the family of the persons whose genealogy was involved, there was ample evidence to support the findings of the master and the trial court.

## VI. The Claimed Kinship to Ullie Eagle of the Several Groups.

█ The claims of the defendants and of the several groups who prosecute this appeal are:

Defendants contend that Ullie Eagle was the daughter of David Eagle and Tochee his wife; that Sundulla or Cundulla Fixico was first married to Lizzie of Tulmochussee Town, and by her had a son Timmie Jesse; that he was next married to Sechehoye of Artussee Town, and by her had a daughter Tochee; that Sechehoye died when Tochee was an infant and thereupon Fixico left Artussee Town and went to the vicinity of Wetumka, where he lived with Lydia or Liddy of Kialigee Town, as his wife, and by her had Nellie Fish; that Sechehoye and Katie Bear were sisters and were the daughters of Miceo Apueka and Ficonnihee; that the deaths of David Eagle, of his father, mother and all his brothers and sisters, of Tochee, and of her half brother Timmie Jesse occurred prior to the death of Ullie Eagle; and that Nellie Fish a paternal half sister of Tochee, and

<hr />

3 A. K. Marsh (Ky.) 326, 13 Am. Dec. 167; Flowers' Lessee v. Haralson, 6 Yerg. (Tenn.) 496; Ringhouse v. Keever, 49 Ill. 471; Carter v. Montgomery, 2 Tenn. Ch. 227.

In Flowers' Lessee v. Haralson, supra, the court said:

"Reputation of pedigree is the result of the public mind, founded upon actual knowledge of the whole community; and experience and knowledge in the nature and habits of man teach the unerring certainty of the public knowledge and conclusion in relation to family history. Individuals may fail in their investigations of particular facts; but where marriages, births and deaths are the facts to be learned, human curiosity saves us the trouble and expense of proving the occurrences by witnesses, present, or by the hearsay of those who were, or of the family connexion. No individual investigations or testimony can generally be equal in certainty to the curious' scrutiny; and if secrecy be attempted, public curiosity sets on foot an anxious search for the truth. General reputation of such facts is not only competent, but highly credible."

In Carter v. Montgomery, supra, the court said:

"In England it is now well settled that hearsay evidence is resorted to in matters of pedigree * * * upon the ground of the interest of the declarants in knowing the connections of the family. The rule is, consequently, restricted to the declarations of deceased persons who were related by blood or marriage to the person from whom the descent is claimed, and general repute in the family proved by a surviving member. * * * It is obvious that while the English rule may be most consonant to sound principle, and may answer the ends of justice in a dense population and settled community, yet it scarcely suffices in a sparsely inhabited country with a migratory and rapidly changing population. It would be utterly inadequate in matters relating to a slave population, where the family is not legally recognized, and, for the same reason, to the settlement of the rights of illegitimates. Where would the negro have been in suits for freedom, after a few years, on a change of domicile by the master, with the presumption of slavery against them by reason of color, if the English rule had been rigidly adhered to? * * * Under our decisions, that so much of the testimony in this case, based upon hearsay or reputation, as relates to the pedigree of James M. Garrett is admissible, whether it comes from members of the family or third persons, to be weighed according to the sources of information, the opportunities of witnesses, and the surrounding circumstances."

See also Wiess v. Hall (Tex. Civ. App.) 135 S. W. 384.

7 On October 22, 1881, the Creeks adopted an act regulating marriage and divorce. Constitution and Laws of Muskogee Nation, 1890, pp. 108, 109. However, it was frequently disregarded.

8 In Grant Bros. Const. Co. v. United States, 232 U. S. 647, 34 S. Ct. 452, 455, 58 L. Ed. 776, the court said:

"It is true that the defendant was not a party to that proceeding, and that, as a general rule, a judgment binds only the parties and their privies. But it is equally true that a judgment in a prior action is admissible, even against a stranger, as prima facie, but not conclusive, proof of a fact which may be shown by evidence of general reputation, such as custom, pedigree, race, death, and the like, and this because the judgment is usually more persuasive than mere evidence of reputation. 1 Starkie, Ev. 386; 1 Greenl. Ev. §§ 139, 526, 555; Patterson v. Gaines, 6 How. 550, 599, 12 L. Ed. 553, 573; Pile v. McBratney, 15 Ill. 314, 319; McCollum v. Fitzsimons, 1 Rich. [S. C.] 252."

See also Neal & Duke of Athol v. Wilding, 93 Eng. Reprint, 1094.

Katie Bear a maternal aunt of Tochee, were the nearest surviving kin of Ullie Eagle at the time of her death.

The Melone Group are the children and grand-children of Winey Tiger. They contend that David Eagle and Tochee were the parents of Ullie Eagle, and that Winey Tiger was a sister of David Eagle. The defendants admit the foregoing facts, but assert that Winey Tiger died before the death of Ullie Eagle, and therefore the Melone Group are further removed than Nellie Fish and Katie Bear. This group denies that Sechehoye was the mother of Tochee.

The Jesse Group are descendants of Timmie Jesse. They contend that Timmie Jesse was the son of Sundulla Fixico and his wife Lizzie; that Timmie Jesse and Tochee were half brother and sister. They admit that Timmie Jesse died before the death of Ullie Eagle. They claim by representation through Timmie Jesse. The defendants admit the facts contended for by the Jesse Group, but deny the proposition of law asserted.

The Hosey-Guthrie Group contend that Tochee was the daughter of Sealie; that Jane Strickland was the sister of Sealie; that Jane Strickland left two children, Patience DePriest and John Strickland. The Hosey Group are descendants of Patience DePriest, and the Guthrie Group are descendants of John Strickland.

The Edwards-Gambler Group are the descendants of Thomas Fulsom, also known as Tom Fulsom, Entharnes Harjo and Pulsummale. They deny that Sundulla Fixico was the husband of Sechehoye. They claim that Fulsom and Sechehoye were married, and that Tochee, the mother of Ullie Eagle, was their child. Fulsom survived Ullie Eagle.

The Wolf Group claims that Micco Apueka and Ficonnihee had two daughters, Sechehoye and Katie Bear; that after the death of Ficonnihee, Micco Apueka married Macha, and by her had a son George Wolf; that George Wolf or George Arpoika was a paternal half brother of Sechchoye and Katie Bear; that George Wolf and Katie Bear were living at the time of the death of Ullie Eagle. The members of this group are the descendants of George Wolf.

The Tolon Group contend that Sally Tolon was a daughter of David Eagle and Nancy Gooden, and a paternal half sister of Ullie Eagle.

## VII. The Facts in Support of Defendants' Claim.

### (a) Admitted Facts.

The following facts are not in dispute. Ullie Eagle was enrolled upon the Creek tribal roll as a full-blood Indian opposite No. 4338. Her census card describes her as being eight years of age in 1900, and a member of Artussee Town. Ullie Eagle was the daughter of David Eagle and Tochee, members of Artussee Town. Ullie Eagle died June 8, 1902, leaving no surviving direct descendants, and no surviving father, mother, brother, or sister. The land in controversy was selected for Ullie Eagle by the Commission to the Five Civilized Tribes on June 30, 1902. Patents therefor dated October 19, 1904, and approved November 26, 1904, were issued to the heirs of Ullie Eagle and recorded December 3, 1904.

### (b) Other Facts.

The following facts are established by the great weight of the oral evidence. Sundulla or Cundulla Fixico was an Artussee Indian, and about the time of the Civil War he lived at Tulmochussee Town with Lizzie, a Tulmochussee Indian, as his wife, and by her had a son Timmie Jesse. Subsequently to 1867 Sundulla Fixico returned to Artussee Town and lived with Sechehoye as his wife, an Artussee Indian, and by her had a daughter Tochee. Sechehoye died at Artussee Town when Tochee was an infant. Thereafter Sundulla Fixico moved to a place near Wetumka, where he lived with Lydia, a Kialigee Indian, as his wife, and by her had a daughter Nellie Fish, who is still living. After the death of Sechehoye, Tochee lived with Katie Bear. Tochee was married to David Eagle at the home of Katie Bear, and died at the latter's home.

Of the witnesses who testified to the foregoing facts, many were relatives of David Eagle and Tochee. Many of such witnesses were members of Artussee Town. Two were leading members of that town, one having been a member of the house of warriors, and another a member of the house of kings of Artussee Town. Timmie Jesse was well known among the members of Artussee Town and Tulmochussee Town. Certain of the witnesses testified that Sundulla Fixico was the father of Timmie Jesse and Tochee. Certain other witnesses testified that Sundulla Fixico was the father of Timmie Jesse and Nellie Fish. While the former group did not know Nellie Fish and the latter group did not know

Tochee, both knew and testified as to the identity of Timmie Jesse. This definitely ties this testimony together and shows that the witnesses were testifying concerning the same Sundulla Fixico. Furthermore Fixico told the witnesses who testified as to Nellie Fish, that he had a daughter by a former marriage named Tochee, who had remained with her relatives at Artussee Town. The evidence established that at that time Tochee was living with Katie Bear her maternal aunt, and with Sealie. Moreover many of the witnesses, who appeared for groups adverse to defendants, testified that Tochee was the daughter of Sundulla Fixico and Sechehoye.

The oral evidence further established these facts:

Sechehoye and Katie Bear were sisters and were the daughters of Micco Apueka and Ficonnihee. Tullip Harjo was the first husband and Nocus Fixico the second husband of Katie Bear. David Eagle, the husband of Tochee and the father of Ullie Eagle, was the son of Harthun Harjo and Leeska, Artussee Indians. Winey Tiger was the daughter of Harjo and Leeska, and a full sister of David Eagle. Ullie Eagle survived Winey Tiger.

Sealie was married to Nocus Harjo. The latter died shortly after the return of the refugees at the close of the Civil War. Sealie had no children. She was the maternal aunt of Katie Bear and Sechehoye.

There were 47 towns in the Creek Nation. These towns were not geographical locations, but were political subdivisions of the Creek Nation, more nearly resembling bands. All of the citizens of the Creek Nation belonged to some town, and the citizen retained his town membership regardless of where he lived. Town membership was changed only by agreement for exchange of members approved by the town kings. Town membership was not affected by marriage. Children belonged to the town of which their mother was a member, and were enrolled accordingly on the town rolls.

The census card of Ullie Eagle showed that she, David Eagle her father, and Tochee her mother, were members of Artussee Town. The mother of Tochee was therefore a member of Artussee Town.

David Eagle and Tochee Eagle appear on the 1890 census roll of Artussee Town.

On the 1882 Artussee Town census roll, Tochee appears in the Katie Bear group. The first name in the group is that of Nocas Fixico, the second is that of Katie, next the three children of Nocas and Katie, whose ages are given as 6, 4, and 2. Following these appears the name of Tochee, age 8. Witnesses familiar with the manner of enrollment upon tribal rolls, testified that the custom was to list first the name of the father, if living, then the mother, then the children according to age, followed by the names of any relatives living with the family. The oral evidence established that Sundulla and Sechehoye were both dead before the 1882 roll of Artussee Town was made.

The appearance of Tochee's name in the family group of Katie Bear on the 1882 roll corroborates the oral testimony that Katie Bear was Tochee's aunt, and that Tochee lived with Katie Bear after the death of Sechehoye.

The 1857 roll of Artussee Town, being the earliest existing roll of that town, contains the following names as members of family group 52: Nocos Harjo, Selar, Sechehoye, and Katy.

On the same roll Micco Apueka appears as Micco Poekar, with his second wife Macha as Macher.

The 1859 Artussee Town roll contains the following names in family group 10: Nocos Harjo, Sarah, Sechehoye, and Katey.

Selar on the 1857 roll and Sarah on the 1859 roll are no doubt Sealie.

On the 1867 Artussee Town roll, family group 7 is as follows: Tullip Harjo, Katey, Seechehochee, and Tumhechee. There was oral evidence that Tumhechee was a son of Tullip Harjo and Katie Bear.

The fact that Katie Bear and Sechehoye appear in the same family groups on the Artussee Town rolls from 1857 to 1867, strongly corroborates the oral testimony that they were sisters. The fact that they appear with Nocus Harjo and Sealie on the 1857 and 1859 rolls supports the oral testimony that Sealie was their aunt.

The census card of Timmie Jesse describes him as being 40 years of age in 1901, and the son of Sunduller Fixico of Artussee Town, and Lizzie of Tulmochussee Town. This corroborates the oral testimony as to the parentage of Timmie Jesse, and the fact that Sundulla Fixico lived with Lizzie before the Civil War.

Sundulla Fixico was enrolled on the 1857 Artussee Town roll as Kontul Fixico. He does not appear on the 1859 Artussee Town roll. It is probable that at that time he had gone down to Tulmochussee Town, and was living with his wife Lizzie, the mother of

Timmie Jesse, and for that reason was over-looked on the 1859 roll.

Fixico is shown on the 1867 roll of Ar-tussee Town as Kuntul Fixico in the Okchun Harjo group.

The census card of Nellie Fish describes her as being 28 years of age in 1901, a Kiali-gee Indian, the daughter of Suatala an Ar-tussee Indian, and Tiddy a Kialigee Indian. The old family card of Nellie Fish describes her as being the daughter of Sontala Fixico, an Artussee Indian. Since there was no oth-er Fixico of Artussee Town with a name sim-ilar to Sundulla, the reference on these cards no doubt is to Sundulla Fixico, and they support the oral testimony that Sundulla Fixico and Lydia were the parents of Nellie Fish.

The 1882 Artussee Town roll shows To-chee to be eight years old on the date of the roll. This would make her birthday in 1874. The census card of Nellie Fish shows that she was 28 years old in 1901. This would make her birthday in 1873. These two rec-ords indicate that Nellie Fish was older than Tochee. The ages given by some of the wit-nesses in their oral testimony indicate that Nellie Fish was older than Tochee. This ev-idence would be persuasive that Sundulla Fixico, the father of Tochee, and Sundulla Fixico, the father of Nellie Fish, were differ-ent persons, but for the fact that Indians are unable to give their ages accurately in years, and have little conception of time in terms of years. They fix the time of events as hap-pening before or after, or at the time of oth-er events of outstanding importance. The ages given in the oral testimony and in the records, since the records were made from oral testimony, can only be regarded as ap-proximate. When these facts are taken in-to consideration, the discrepancy in the ages of Tochee and Nellie Fish carries slight weight against the overwhelming testimony to the contrary.

We conclude, therefore, that both the oral testimony and the documentary evidence sup-port the findings of the master and the trial court that Nellie Fish was the sole heir of Ullie Eagle. This affirmative finding requires a denial, as far as the facts are concerned, of the claims of the several groups adverse to defendants.

## VIII. The Contention of the Groups Adverse to Defendants.

This brings us to a consideration of the contentions of the several groups adverse to the defendants.

### Melone Group.

Winey Tiger was the sister of David Ea-gle. Tochee and Nellie Fish were half sis-ters. Sechehoye and Katie Bear were sis-ters. Katie Bear and Nellie Fish survived Ullie Eagle. Ullie Eagle survived Winey Ti-ger. It follows that Nellie Fish and Katie Bear were nearer of kin to Ullie Eagle than the heirs of Winey Tiger.

■ Counsel for the United States contend that the master erred in admitting certain judgments in state court actions, which de-termined questions of pedigree, and which tended to support defendants' claims. Such judgments were binding on the parties to such actions who are parties to the instant case, and prima facie evidence but not conclusive against the other parties to the instant case. See Note 8, supra.

### Wolf Group.

George Wolf or George Arpoika was the paternal half brother of Sechehoye and Ka-tie Bear. George Wolf was living at the time Ullie Eagle died. The claim of this group fails because Nellie Fish was nearer of kin to Ullie Eagle than was George Wolf.

### Edwards-Gambler Group.

The proof that Sundulla Fixico was To-chee's father refutes the claim of this group that Tochee was the daughter of Thomas Ful-som and Sechehoye.

The oral evidence introduced by this group does not afford satisfactory proof, if there were no evidence to the contrary, that Fulsom was Tochee's father. The claim that such fact is shown by the documentary evi-dence rests on the doubtful identity of Ful-som as Tumhechee on the 1867 Artussee Town roll, and the doubtful inference therefrom that Seechehochee and Tumhechee were hus-band and wife. There is oral evidence that Tumhechee was the son of Tullip Harjo and Katie. If Tumhechee and Sechehoye had been husband and wife, they would have been plac-ed in a separate family group. On the con-trary, if Sechehoye had been single and Tum-hechee had been the child of Tullip and Ka-tie, we should expect them to be included as they appear in the family group of Katie.

Furthermore there is convincing proof both oral and documentary that Fulsom was never married to Sechehoye, and was not the father of Tochee, and that Tochee was the daughter of Sundulla Fixico and Sechehoye.

### Tolon Group.

This group introduced evidence tending to show that David Eagle and Nancy Gooden

were married shortly after the Isparhecher War, which occurred in 1882, and were still living together at the time of the death of Frank Gooden, which occurred on October 11, 1888; that shortly thereafter David Eagle and Nancy Gooden separated; that about three months later Sally Tolon was born to Nancy Gooden; and that Sally Tolon was the daughter of David Eagle and a half sister and the nearest surviving kin of Ullie Eagle.

An unusually large payment of $29 per member was made in 1890. Oral testimony of the defendants shows that David Eagle and Nancy Gooden separated shortly after the death of Frank Gooden, and about two years before the $29 payment. The 1890 Artussee Town roll shows that David Eagle and Tochee were then living together. Nancy Gooden appears on the 1890 Concharty Town roll. Neither the name of Sally West, Sally Tolon, nor any similar name appears on the 1890 roll or the 1891 omitted roll. On account of the unusually large payment to which she would have been entitled if then living, it is unlikely that Sally Tolon would have been omitted from both of these rolls.

The Dawes Commission enrolled Sally West on November 20, 1899. It found that she was then eight years of age, that George West was her father and Nancy Gooden her mother, and that Nancy Gooden appeared on the 1890 Concharty Town roll and Sally Tolon on the 1895 Concharty Town roll. The Dawes Commission, therefore, fixed the birthday of Sally Tolon as being in 1891, about two years after the separation of David Eagle and Nancy Gooden.

It was generally understood among the members of the West family and in the community that Sally Tolon was the illegitimate daughter of George West and Nancy Gooden.

Bessie Tolon née Gooden, a sister of Nancy Gooden, and one of the witnesses for this group, made two affidavits, one on January 12, 1916, and the other on July 29, 1922, in which she stated that Sally Tolon was the daughter of George West and Nancy Gooden. In the probate court proceedings in the county court of Okmulgee County for the administration of the estate of George West, the surviving members of the West family, including Sally Tolon, both asserted and stipulated that Sally Tolon was the daughter of George West and Nancy Gooden, and the county court so adjudged in such proceedings on July 9, 1917. During the years 1916 and 1917, Sally Tolon asserted in correspondence with the superintendent of the Five Civilized Tribes, that she was entitled to participate in the estate of Cogee West the daughter of George West.

We conclude that the master and trial court correctly found that Sally Tolon was the daughter of George West, and not of David Eagle.

### Hosey-Guthrie Group.

The evidence of this group satisfactorily established that Patience DePriest was a niece and John Strickland a nephew of Sealie. The witnesses for this group, two of whom had been adjudged incompetent and three of whom had served terms in the penitentiary, testified that they knew Sealie. Certain of them stated that she ran a boarding house at Okmulgee and had a small child living with her named Tochee, whom she called her daughter. These witnesses knew little about the relationships in Artussee Town. There was testimony that the Sealie and Tochee who lived at Okmulgee were not the same Sealie and Tochee who lived at Artussee Town. There was also evidence that Sealie was married to Nocus Harjo, that the latter died about the time of the return of the Creek refugees at the close of the Civil War, and that Sealie had no children. This evidence, together with the proof that Tochee was the daughter of Sechehoye, refutes the claims of this group.

### Jesse Group.

Sections 6 and 8, Laws of Muskogee Nation 1880, p. 132 (Okl. Indian Land Laws, Mills, 2d Ed., § 261, p. 265), read as follows:

"Be it further enacted that if any person die, without a will, having property and children, the property shall be equally divided among the children by disinterested persons and in all cases where there are no children, the nearest relation shall inherit the property.

"The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no other heirs, and an heir's part if there should be other heirs in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner."

Under the provisions of section 28 of the original Creek agreement, 31 Stat. 861, 870, Thomas, Five Civilized Tribes and Osage Nation, p. 119, the above-quoted Creek statute governs the descent and distribution of the property of Ullie Eagle.

The Jesse Group contends that they are entitled to take by representation the share

of Timmie Jesse, who was a half brother of Tochee.

It is conceded that under the plain and literal interpretation of this statute, the Jesse Group is one degree further removed than Nellie Fish.

To avoid the effect of this Creek statute, the Jesse Group introduced certain payrolls of the Government and certain decisions of the supreme court of the Creek Nation in an effort to show that under the custom of the Creeks the doctrine of representation was recognized. The reports of the decisions of the supreme court of the Creek Nation are fragmentary in character. They do not show that they were true cases of representation. The distinction we have in mind may be thusly illustrated. If a decedent whose property was being divided left two surviving brothers, one of whom died before the division, the recognition of the rights of the children of the latter to participate in the division would not be a true case of representation. On the contrary, if one of such brothers died before the decedent whose property was being divided, recognition of the rights of the children of such deceased brother would be a true case of representation. The decisions introduced do not show that they were cases like the latter, nor that they were cases like the former example.

The payments made by the Government were in pursuance of a letter written by an acting Commissioner of Indian Affairs, who set out the Arkansas statute on descent and distribution, which makes express provision for the right of representation. The acting commissioner said that the Arkansas law of distribution and the Creek law of descent and distribution "as the department understands" are identical, except as to one point not here material. The Creek law was not identical with the Arkansas law, because the former did not and the latter did expressly provide for the right of representation. This letter and the payments made under it are of little if any evidentiary value in arriving at a true interpretation of the Creek statute.

The Jesse Group also introduced a number of lawyers as witnesses, who had practiced in the Creek tribal court, and who testified concerning the doctrine of representation in the Creek Nation. Two of them said the doctrine of representation did not carry over to collateral relatives and these therefore became witnesses against the contentions of this group. Others said that the judge who distributed the property of a deceased Creek went upon the land with the nearest relatives and talked over with them the question of whether the children of the deceased child should take. If the others were willing, a share was allotted to the children of such deceased child. In short the evidence of this group does not disclose a clear custom existing among the Creeks recognizing the doctrine of representation, and nothing less than clear proof should be allowed to prevail over the unambiguous language of this statute.

On the other hand the defendants introduced evidence of persons learned in the Creek law to the effect that the doctrine of representation was not recognized by the Creeks.

In De Graffenreid v. Iowa Land & Trust Co., 20 Okl. 687, 95 P. 624, the court gave exhaustive consideration to the interpretation of this Creek statute, and of the Creek customs bearing thereon. It concluded that the statute should be construed to recognize the doctrine of representation as to descendants of the children of a deceased child, but not collateral relatives.

In Tiger v. Wildman, 116 Okl. 171, 244 P. 24, the court refused to extend the doctrine of representation recognized in the De Graffenreid Case, to descendants of brothers and sisters of a decedent.

We therefore conclude that the Jesse Group are not entitled to take by right of representation under the Creek statute.

## IX. Conclusion.

After a painstaking examination of the record and the contentions of the several groups, we are not convinced that the master and trial court committed any error of law or made any serious mistake of fact.

The decree is therefore affirmed.